1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KRISTAL NUCCI, et al., | Case No. 19-CV-01434-LHK |
| Plaintiffs, | **ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION** |
| v. | |
| RITE AID CORPORATION, et al., | Re: Dkt. Nos. 45, 58 |
| Defendants. | |

Plaintiffs Kristal Nucci, Ana Goswick, and Kelly Shaw ("Plaintiffs") bring this putative class action against Defendants Rite Aid Corporation and Thrifty Payless, Inc. (collectively, "Defendants" or "Rite Aid"). Plaintiffs allege that Defendants required Plaintiffs and putative class members to purchase their own uniforms in violation of California law. Before the Court is Defendants motion to strike Plaintiffs' expert report and Plaintiffs' motion for class certification. Having considered the parties' briefing, the relevant law, and the record in this case, the Court DENIES Defendants' motion to strike and GRANTS Plaintiffs' motion for class certification.

I.      **BACKGROUND**

  A.  **Factual Background**

Defendants operate retail drug stores throughout the United States, including

United States District Court
Northern District of California

United States District Court
Northern District of California

1    approximately 544 stores in California.  ECF No. 54 ("Robinson Decl."), Ex. 1 at 11.  Plaintiffs

2    are non-exempt employees who worked in California Rite Aid stores at some point during the

3    alleged Class Period from March 13, 2015 through any trial date.  Plaintiffs allege that Defendants

4    required non-exempt employees—excluding pharmacists, pharmacy interns, and asset protection

5    agents—to purchase work uniforms without reimbursement in violation of California law.  ECF

6    No. 45 at 6-7.

7         In June 2012, Defendants implemented a written company policy concerning dress

8    standards.  ECF No. 57-5 ("Ceballos Decl."), Exs. A and B.  According to Defendants' Store

9    Dress Standards, employees must wear clothing consistent with Defendants' "Team Colors" of

10   navy blue tops and khaki bottoms.  *See id*.; *see also* ECF No. 54 ("Robinson Decl."), Ex. 4 at 11

11   ("Rite Aid has adopted a contemporary 'Team Colors' approach for associates who interact with

12   our customers.  Our signature navy blue and khaki Team Colors look focuses on comfort, team

13   unity, and helps to project a friendly, neighborhood environment in our stores . . . .").  Rite Aid's

14   Handbook devotes an entire section to "Team Colors" and provides that "Team Colors attire is

15   mandatory in our store environment."  Robinson Decl., Ex. 4 at 11.  Defendants' Team Colors

16   policy also required employees to wear either a polo, button-down shirt, blouse, sweater, skirt, or

17   slacks and prohibited employees from wearing T-shirts and jeans.  Ceballos Decl., Ex. A at 3, 5, 9.

18   Defendants' official written policies also explain that "[a]ssociates who report to work

19   inappropriately . . . dressed may be asked to leave and change into acceptable clothing or to

20   otherwise correct the violation.  In such instances, the time away from work may be without pay."

21   Robinson Decl., Ex. 4 at 12.

22        Furthermore, Defendants' written company policy charges store managers and field leaders

23   to communicate and enforce dress standards.  Ceballos Decl., Ex. B at 1 ("Store and Pharmacy

24   Managers along with Field Leaders will primarily be responsible for monitoring and enforcing this

25   policy.").  As Defendants' own corporate representative noted, Defendants' New Hire Orientation

26   kit is intended to be reviewed by management with every new employee, Ceballos Dep. 38:9–

27   40:7, and the New Hire Orientation kit also admonishes employees to "remember to wear your

28
                                              2

name badge and dress in Team Colors during working hours," Robinson Decl., Ex. 10 at 2.

At the same time, Defendants' written company policy allows for what the parties call the "blue vest" alternative.  Defendants' written company policy notes that "[i]n the event an associate is unable to report to work in team colors, Rite Aid will make available a company issued vest, which he/she will be required to wear."  Ceballos Decl., Ex. A at 9; *id.*, Ex. B at 1 ("Each store will be supplied with company issue vests (navy blue) that will be available for those associates who are unable to meet Rite Aid's navy blue requirement or report to work wearing a color other than navy blue.").  Employees "can wear a blue vest at any time," and if an associate is not dressed according to Team Colors, wearing a blue vest puts that associate in compliance with Defendants' dress standards.  Ceballos Dep. at 42:9-12, 54:8-10; *see also* ECF No. 57-6, Ex. 2 at 1640 (2012 email regarding Defendants' Team Colors policy that explains that "[i]t is ok if an associate can't or won't convert to team color.  They may wear the navy blue vest.  These vests will remain available on an ongoing basis.").

Plaintiffs contend, however, that the blue vest policy is not a real alternative to Defendants' Team Colors approach.  In support of this argument, Plaintiffs point to two pieces of evidence.  First, Plaintiffs emphasize a recent survey conducted by Defendants that asks Rite Aid California store managers how many blue vests are present in their stores.  471 of 544 California stores responded to this survey.  According to those stores, there were no blue vests in 337 stores, only one blue vest in 23 stores, and two blue vests in 26 stores.

Second, Plaintiffs point to the expert report of Dr. Jeffery S. Peterson, Ph.D., who conducted a survey of 49 Rite Aid employees in California.  ECF No. 54, Ex. 7 ("Peterson Decl.").  Dr. Peterson explained that "[t]he sample size of 49 survey responses is large enough to draw statistical inferences about the population of potential class members" and that "[t]he survey responses are valid and reliable."  *Id.* ¶ 4.  Of the 49 survey responses, 100 percent of respondents said they were required to wear a navy-blue shirt, 98.0 percent of respondents said they were required to wear khaki-colored pants, 95.9 percent of respondents said they purchased a navy-blue shirt to comply with the dress code, 91.8 percent of respondents said they purchased khaki-colored

United States District Court
Northern District of California

1    pants to comply with the dress code, 6.1 percent thought they could wear a Rite Aid blue vest

2    instead of a blue shirt on a regular basis, and 30.6 percent of respondents said they saw a Rite Aid

3    blue vest in a store where they worked. *Id*. ¶ 3.  Therefore, Plaintiffs contend that Dr. Peterson's

4    report demonstrates that Defendants' blue vest policy was not put into practice such that Plaintiffs

5    and putative class members were required to purchase their own uniforms in violation of

6    California law.

7        In response, Defendants dispute the reliability of this evidence.  With respect to the survey

8    of blue vests available in California Rite Aid stores, Defendants argue that the survey only covers

9    "a single date in late 2019," which "says nothing about vest availability on a classwide basis over

10    the five-year class period."  ECF No. 57. at 17.  Defendants also contend that the one-day survey

11    was flawed because store managers answered the survey questions incorrectly and sought to

12    update or modify their responses after the responses were finalized.  *Id*. at 13.  Additionally,

13    Defendants argue the survey questions were flawed because the responses did not note that some

14    associate may have taken their vests home, "which means that though they are not present in

15    stores, they are still available for use."  *Id*.

16        In terms of Dr. Peterson's expert report, Defendants argue that the report "should be

17    stricken in whole because it is inadmissible, unreliable, and improper pursuant to Federal Rules of

18    Evidence, Rule 702."  ECF No. 58 at 1.  Defendants put forth their own expert, Dr. Joseph A.

19    Krock, Ph.D., who objects to Dr. Peterson's report.  ECF No. 57-6, Ex. 1 ("Krock Decl.").

20    Defendants thus argue that Dr. Peterson's opinions are "unreliable as they are premised on

21    assumptions and a biased survey."  ECF No. 58 at 2.

22        Moreover, in addition to challenging the validity of Plaintiffs' evidence, Defendants

23    proffer their own evidence to argue that class certification is unwarranted.  Regarding the

24    availability of blue vests in California stores, Defendants provide evidence that in 2012, three

25    years before the beginning of the Class Period, Defendants mailed 16 blue vests in varying sizes to

26    each of its California stores.  ECF No. 57-6, Ex. 3 at Rite_Aid_706-750; *id*., Ex. 5 ("Mee Depo.")

27    at 32:14-18.  According to Defendants, when individual store managers needed additional blue

United States District Court
Northern District of California

28

4

vests, they could place an order and the blue vests would be shipped to that store.  Mee Depo. at

24:2-19.  In subsequent years, Defendants continued to ship hundreds of blue vests in response to

individual orders from California stores.  ECF No. 57-6 at 128-132; Mee Depo. at 24:2-19.

Defendants also obtained sworn declarations from a number of store managers,

supervisors, and employees.  These declarations suggest that some store managers and supervisors

permitted employees to wear colors that were not fully compliant with Defendants' official written

policies.  For example, some store managers and employees explained that employees were

allowed to wear black-colored or grey-colored shirts and pants as well as navy blue shirts and

khaki pants.  ECF No. 57-6, Ex. 47 ("Macintosh Decl.") ¶ 5 ("[I]f employees wear any shade of

khaki, brown, black or other dark color pants, as long as they are clean, it is acceptable in my

store."); *id.*, Ex. 39 ("Jung Decl.") ¶¶ 7, 10 ("I used to wear a pair of gray pants to work that I

interpreted to be khaki without issue. . . . I have never been told I was wearing the wrong color of

clothing to work."); ECF No. 57-6, Ex. 46 ("Luna Decl.") ¶ 4 ("I usually wear blue shirts, but

sometimes I wear black shirts.  Today was cold so I put on a black sweatshirt.  My manager did

not say anything to me about wearing the wrong color."); ECF No. 57-6, Ex. 19 ("Attanasio

Decl.") ¶ 10 ("I have seen some coworkers wear black pants to work at Rite Aid.")

Additionally, Defendants' declarations also state that some store managers and shift

supervisors allowed employees to wear T-shirts and jeans in contravention of Defendants' official

written policies.  *See, e.g.*, *id.*, Ex. 17 ("Alexander Decl.") ¶ 14 ("It is not a problem for me if

associates wear jeans or black pants on occasion."); *id.*, Ex. 49 ("Manning Decl.") ¶ 15 ("I have

seen Rite Aid employees wear jeans and black pants to work, but not often."); *id.*, Ex. 56 ("Rai

Decl.") ¶ 11 (store leader stating that "[t]he top can be a sweater, blouse, button-down shirt, polo,

T-shirt, tunic, cardigan, sweatshirt, vest" and that "[a] blue dress would also be okay."); *id.*, Ex. 38

("Jhally Decl.") ¶ 5 ("Most employees wear casual fitting pants but some choose to wear jeans.

Both are acceptable to me."); ECF No. 57-6, Ex. 63 ("Siatunuu Decl.") ¶ 8 (store leader permitting

"a sweater, blouse, button-down shirt, polo, T-shirt, tunic, cardigan, sweatshirt, [or] vest" as a top

and permitting "pants, jeans, slacks, corduroys, chinos, capris, or skirts" for bottoms).

**B. Procedural History**

On March 19, 2019, Plaintiffs filed this putative class action against Defendants. ECF No. 10. On October 2, 2019, the last day for Plaintiffs to file an amended complaint, Plaintiffs filed the operative Second Amended Complaint. ECF No. 30 ("SAC").

Plaintiffs allege that Defendants compelled Plaintiffs and putative class members to purchase uniforms in violation of California law. Accordingly, the SAC asserts six causes of action: (1) failure to indemnify business expenses in violation of California Labor Code § 2802; (2) failure to provide uniforms in violation of Wage Order No. 7-2001, § 9(A); (3) failure to pay minimum wage in violation of California Labor Code §§ 1194, 1194.2, and 1197 and Wage Order No. 7-2001, § 4(A)); (4) failure to furnish accurate wage statements in violation of Labor Code § 226; (5) waiting time penalties pursuant to California Labor Code §§ 201, 202, and 203; and (6) restitution under California's Unfair Competition Law, Business and Professions Code § 17200, *et seq*. SAC ¶¶ 40-76. In addition to these class claims, the SAC also includes a claim for public injunctive relief and a claim under California Private Attorney General's Act ("PAGA"), California Labor Code § 2698, *et seq. Id*. ¶¶ 77-90. On October 17, 2019, Defendants filed an answer to the SAC. ECF No. 33.

On February 6, 2020, Plaintiffs filed a motion for class certification. ECF No. 45 ("Mot."). Plaintiffs seek to certify a California class of approximately 26,232 "non-exempt employees, excluding pharmacists, pharmacy interns, and asset protection agents, working in any Rite Aid store in California at any time from March 13, 2015 through the trial date (the 'Class Period')." Mot. at 24-25. On March 10, 2020, Defendants filed an opposition to Plaintiffs' motion for class certification. ECF No. 57 ("Opp."). On April 3, 2020, Plaintiffs filed a reply. ECF No. 63 ("Reply").[1]

---

[1] On April 10, 2020, Defendants filed objections to new evidence submitted with Plaintiffs' Reply. ECF No. 66. "New evidence submitted as part of a reply is improper" because "the opposing party is deprived of the opportunity to respond." *Morris v. Guetta*, 2013 WL 440127, at *9 n.8 (C.D. Cal. Feb. 4, 2013) (citing *Tovar v. U.S. Postal Serv.*, 3 F.3d 1271, 1273 n.3 (9th Cir. 1993)). As a result, the Court "will not consider" the "new evidence raised for the first time in reply." *Roe v. Doe*, 2009 Wl 1883752, at *5 (N.D. Cal. June 30, 2009); *see also Cubic Telecom Ltd. v. Wang*, 2015 WL 12656238, at *5 (N.D. Cal. Aug. 20, 2015) ("Generally, new evidence or issues raised

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

In addition to the briefing concerning class certification, on March 10, 2020, Defendants filed a motion to strike the report of Plaintiffs' expert, Dr. Peterson.  ECF No. 58 ("MTS").  Plaintiffs filed an opposition to Defendants' motion to strike on April 3, 2020, ECF No. 64 ("MTS Opp."), and on April 10, 2020, Defendants filed a reply in support of their motion to strike, ECF No. 65 ("MTS Reply").

## II.  LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure.  Rule 23 does not set forth a mere pleading standard.  To obtain class certification, Plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001).  "A party seeking class certification must affirmatively demonstrate . . . compliance with the Rule[.]"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action.  *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that Plaintiffs "satisfy through evidentiary proof" at least one of the three subsections of Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rule 23(b) sets forth three general types of class actions.  *See* Fed. R. Civ. P. 23(b)(1)–(b)(3).  As relevant here, Plaintiffs seek certification under Rule 23(b)(3).  A class may be certified under Rule 23(b)(3) if a court finds that "questions of law

for the first time on Reply should not be considered.").

or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]'" *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 569 U.S. at 34 (discussing how Congress included "addition[al] . . . procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (*e.g.*, an opportunity to opt out)" and how a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id*. If a court concludes that the moving party has met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.   DISCUSSION

In the instant case, Plaintiffs allege class claims for (1) failure to indemnify business expenses in violation of California Labor Code § 2802; (2) failure to provide uniforms in violation of Wage Order No. 7-2001, § 9(A); (3) failure to pay minimum wage in violation of California Labor Code §§ 1194, 1194.2, and 1197 and Wage Order No. 7-2001, § 4(A)); (4) failure to furnish accurate wage statements in violation of California Labor Code § 226; (5) waiting time penalties pursuant to California Labor Code §§ 201, 202, and 203; and (6) restitution under California's Unfair Competition Law, Business and Professions Code § 17200, *et seq*. SAC ¶¶ 40-76; Mot. at

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

9.

The crux of Plaintiffs' case, however, centers on the allegation that Defendants required members of the putative class to purchase their own uniforms.  Mot. at 9.  Plaintiffs argue that "by requiring members of the putative class to purchase their own uniforms, Rite Aid effectively pushes their wages below the legal minimum."  *Id*.  Indeed, "[a]n employee who has ostensibly been paid the minimum wage but has been required to make an expenditure which reduces the employee's net income below the minimum wage is, in essence, in the same position as an employee who was paid less than the minimum wage at the outset."  *Sanchez v. Aerogroup Retail Holdings, Inc.*, 2013 WL 1942166, at *10 (N.D. Cal. May 8, 2013).

The same is true of Plaintiffs' claims for inaccurate wage statements and waiting time penalties, which are based in part "on the theory that the amounts Rite Aid failed to reimburse for uniform expenses are themselves wages which, for example, are owed at termination for employment under Labor Code §§ 201 and 202."  *Id*. at 9–10.  Indeed, "[a] number of California courts have held that reimbursements for uniform expenses are wages" and could therefore be subject to Labor Code §§ 201 and 202.  *Sanchez*, 2013 WL 1942166, at *13 (collecting cases); *Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329, 367 (2017) ("[P]ayment to employees for work uniforms is a part of the employees' compensation and should be considered like any other payment of wages, compensation or benefits." (quotation marks omitted)).

As a result, the Court follows the parties' arguments and focuses its attention on Plaintiffs' claim that Defendants failed to provide uniforms in violation of California Labor Code § 2802 and California Industrial Welfare Commission Wage Order No. 7-2001 ("Wage Order 7").

California Labor Code § 2802 provides that "an employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties."  Cal. Labor Code § 2802(a).  "Consistent with the policy that the employer may not shift onto the employee the cost of doing business, if an employer requires an employee to wear a uniform, he must provide the uniform" pursuant to Wage Order 7.  *Greer v. Dick's Sporting Goods, Inc.*, 2017 WL 1354568, at *11 (E.D. Cal. Apr. 13, 2017) (quoting Wage

United States District Court
Northern District of California

9

1    Order 7).  Section 9(a) of Wage Order 7 defines a "uniform" to include "apparel or accessories of

2    distinctive design or color."  Courts, in turn, interpret "distinctive design or color" to mean "usual

3    and generally usable in the occupation," in accord with the California Industrial Welfare

4    Commission ("IWC") and the California Department of Labor Standards Enforcement ("DLSE").

5    *See Becerra v. RadioShack Corp.*, 2012 WL 6115627, at \*4 (N.D. Cal. Dec. 10, 2012)

6    (interpreting Wage Order 7's definition of "distinctive design or color" based on IWC and DLSE

7    interpretations); *Greer*, 2017 WL 1354568, at \*11 ("The Wage Orders define 'uniform' to include

8    'apparel or accessories of distinctive design or color.'  The principal exception to the rule is that

9    employers are not responsible for providing uniforms if they require 'basic wardrobe items which

10   are usual and generally usable in the occupation . . . .'" (relying on *Becerra*, 2012 WL 6115627, at

11   \*5); *Brown v. Abercrombie & Fitch Co.*, 2015 WL 9690357, at \*14 (C.D. Cal. July 16, 2015)

12   ("California Labor Code Section 2802 and Wage Order 7 require that an employer must indemnify

13   employees for all necessary expenditures and that uniforms must be provided by that employer.

14   Moreover, apparel of 'distinctive design or color' constitutes a uniform.  One relevant exception to

15   the category of uniforms for which an employer must pay is a uniform that is 'generally usable in

16   the employees' occupation,' such as a nurse's white uniform." (quotation marks omitted) (citing

17   DLSE Opinion Letter No. 1991.02.13)).

18        As a result, to establish classwide liability pursuant to Wage Order 7, Plaintiffs must be

19   able to provide common, classwide proof that (1) the clothing is required by an employer, (2) it is

20   "of distinctive design or color," and (3) it is not "usual and generally usable in the occupation."

21   *See Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341, 1359 (2012) ("Thus, in order to determine

22   whether certain wardrobe items constitute a 'uniform' within the meaning of subdivision 9(A) [of

23   Wage Order 7], courts must consider whether the dress code policy requires wardrobe items that

24   are usual and generally usable in the occupation and whether those items have a distinctive design

25   or color." (quotation marks omitted)).  The same is true for a uniform reimbursement claim under

26   Section 2802.  *Townley v. BJ's Restaurants, Inc.*, 37 Cal. App. 5th 179, 185 (2019) (dismissing

27   Section 2802 claim because plaintiff's counsel conceded that clothing purchases did not satisfy

28

10

1    Wage Order 7's requirement that the clothing be "part of a 'uniform'" and "generally usable in the

2    [restaurant] occupation"); *see also* Mot. at 18 n.8 ("Plaintiffs discussion here assumes, without

3    conceding, that the elements of a section 2802 claim are the same as a claim under the Wage

4    Order.").

5           Here, Plaintiffs argue that their evidence provides a common, classwide method of proof

6    for liability.  Specifically, Plaintiffs contend that the Dr. Peterson's expert report, its underlying

7    survey evidence, the November 2019 survey regarding blue vest availability, and Defendants'

8    official written policies themselves all supply common, classwide methods of proof regarding

9    Defendants' liability pursuant to Section 2802 and Wage Order 7.

10          Defendants disagree and move to strike Dr. Peterson's expert report and its underlying

11   survey evidence.  *See* MTS at 4-11.  Additionally, Defendants proffer numerous declarations from

12   Rite Aid employees regarding the store-by-store variation with respect to interpretation and

13   enforcement of Defendants' dress standards.  *See* ECF No. 57-6.  The Court begins by analyzing

14   Defendants' motion to strike Dr. Peterson's expert report and its underlying survey evidence

15   before turning to Plaintiffs' motion for class certification.

16       **A.  Motion to Strike**

17          Dr. Peterson's report assesses whether a survey conducted by Davis Research could be

18   used to assist in making determinations about liability in the instant case.  ECF No. 54, Ex. 7

19   ("Peterson Decl.") ¶ 1.  Specifically, the research objectives of the survey conducted by Davis

20   Research were to determine (1)  whether Rite Aid employees thought they had to follow a dress

21   code of a navy-blue shirt and/or khaki pants; (2)  whether Rite Aid employees made purchases to

22   comply with that dress code; (3) whether Rite Aid employees thought a blue vest was a valid

23   substitute for a blue shirt or khaki pants; and (4) whether Rite Aid employees potentially had

24   access to a blue vest.  *Id.* ¶ 27.

25          Dr. Peterson explained that Defendants randomly selected 1,217 class members and

26   provided their contact information to Plaintiffs and Davis Research.  *Id.* ¶¶ 30, 41.  Dr. Peterson

27   told Davis Research, the organization conducting the survey, to obtain only 50 survey responses

28

United States District Court
Northern District of California

11

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

from the list of 1,217 class members randomly selected by Defendants.  *Id.*  Davis Research made 1,145 attempted contacts for the survey, and out of those 1,145 attempted contacts, there were 49 "valid" responses, 48 refusals, 214 had invalid or wrong numbers, and 931 were contacted but did not respond.  *Id.*

Of these 49 survey responses, 100 percent of respondents said they were required to wear a navy-blue shirt, 98.0 percent of respondents said they were required to wear khaki-colored pants, 95.9 percent of respondents said they purchased a navy-blue shirt to comply with the dress code, 91.8 percent of respondents said they purchased khaki-colored pants to comply with the dress code, 6.1 percent thought they could wear a Rite Aid blue vest instead of a blue shirt on a regular basis, and 30.6 percent of respondents said they saw a Rite Aid blue vest in a store where they worked.  *Id.* ¶ 3.  Dr. Peterson stated that "[t]he sample size of 49 survey responses is large enough to draw statistical inferences about the population of potential class members" and that "[t]he survey responses are valid and reliable."  *Id.* ¶ 4.

Defendants disagree and move to strike Dr. Peterson's expert report and the underlying survey as inadmissible, unreliable, and improper pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See* MTS at 4-11.  Plaintiffs first argue that as a threshold issue, Defendants' motion to strike should be denied because it violates the Local Rules.  MTS Opp. at 2-3.  In the alternative, Plaintiffs respond that Defendants' arguments go to weight and not admissibility, and therefore, the Court should deny Defendants' motion to strike.  *Id.* at 3-10.

Civil Local Rule 7–3(a) states that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum."  Defendants' objections to the evidence submitted in support of the motion for class certification were filed separately from their opposition.  Thus, Defendants failed to comply with Civil Local Rule 7–3(a).

Courts have refused to consider objections in such circumstances.  *See Nevarez v. Forty Niners Football Co., LLC*, 326 F.R.D. 562, 591 (N.D. Cal. 2018); *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011), *abrogated on other grounds by Campbell*

12

United States District Court
Northern District of California

United States District Court
Northern District of California

*v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018) ("The Court finds that Plaintiffs' two [motions to strike] violate [the] Local Rule[s] and Defendants' [motion to strike] violates [the] Local Rule[s].  Both parties have attempted to evade the briefing page limits by filing [motions to strike] instead of fully voicing their evidentiary and procedural objections in their opposition and reply briefs as required by the Local Rules.  Accordingly, the Court DENIES all [motions to strike] and will only address the evidentiary arguments to the extent they are raised in the parties' briefs.").  Indeed, "[d]enial of a motion as the result of a failure to comply with local rules is well within a district court's discretion."  *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1131 (9th Cir. 2012).  Accordingly, Defendants' noncompliance with the Local Rules constitutes an independent basis for denying the motion to strike.

Alternatively, even considering the merits, the Court concludes that Defendants' motion to strike should be denied.  *See United States v. Vortman*, 2017 WL 1493100, at *3 (N.D. Cal. Apr. 26, 2017) (Even when a "motion is procedurally deficient, and the Court has discretion to dismiss the motion on that basis," courts may exercise their discretion and "analyze the merits" of any such motion "in the interest of resolving motions on the merits."); *see also In re High-Tech Employee Antitrust Litig.*, 289 F.R.D. 555, 586 (N.D. Cal. 2013) (considering defendants' motion to strike on the merits even though it was filed separately from the underlying class certification briefing).

Typically, "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility."  *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 n. 8 (9th Cir. 1997) ("However, as long as they are conducted according to accepted principles, survey evidence should ordinarily be found sufficiently reliable under *Daubert.*" (quotation marks omitted)).  Indeed, the Ninth Circuit has "made clear that technical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010).

Here, Defendants seek to exclude Dr. Peterson's report and survey evidence, but their

13

1   arguments go to weight, not admissibility.  Defendants argue that the Court should strike Dr.

2   Peterson's report and the underlying survey because, according to Defendants, the survey

3   responses were not randomly selected, the sample size was too small, and responses were possibly

4   tainted by self-interest bias.  MTS at 5-10.  But as Dr. Peterson explained, Defendants randomly

5   selected the 1,217 class members and provided their contact information to Plaintiffs.  Peterson

6   Decl. ¶ 41.  The list was then randomized again before calling respondents, and each person had

7   an equal chance of being called.  *Id.*  Davis Research made 1,145 attempted contacts for the

8   survey, and out of those 1,145 attempted contacts, there were 49 "valid" responses, 48 refusals,

9   214 had invalid or wrong numbers, and 931 were contacted but did not respond.  *Id.*

10       Dr. Peterson's expert report notes that the survey results exhibited a low margin of error

11  and met generally accepted criteria for "a valid, large-sample confidence interval."  *Id.* ¶ 53

12  ("[T]he sample is randomly selected and the sample size is greater than 30," and therefore "[t]he

13  sample size of 49 survey responses meets the criteria for a valid large-sample confidence interval."

14  (citing McClave, James and Terry Sincich, *Statistics, 13th Edition*, Pearson: Boston, 2017 p.

15  321)).  Additionally, as Dr. Peterson clarified, the 214 non-working invalid telephone numbers

16  were not a potential source of bias because "[a]ccording to peer-reviewed research on wage and

17  hours survey, . . . there is no reason an individual without a working telephone number should be

18  any different than any of the other class members."  *Id.* ¶ 31.

19       Defendants nonetheless argue that the non-responses were not randomized or

20  representative because Davis Research did not follow up with the 931 respondents who were

21  contacted but did not respond and because 48 putative class members declined to participate in the

22  survey.  Defendants claim that Plaintiffs were required to select only 50 class members, attempt to

23  collect responses from them, and then "[i]f any of the 50 selected putative class members had

24  disconnected numbers or were truly unreachable, then randomly select[] replacement names."

25  MTS at 6 (citing Krock Decl. ¶ 27).   However, as Plaintiffs note, "Dr. Krock provides no

26  authority for this . . . proposition," and Dr. Krock's method "is contrary to the survey authorities

27  relied on by Dr. Peterson."  MTS Opp. at 5; *see* Peterson Decl. ¶ 47–48.  Furthermore, at bottom,

28  

14

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1    Defendants are merely arguing that Dr. Krock's methodology is better than Dr. Peterson's, but at

2    best, such contentions go to weight and not admissibility.  *Fortune Dynamic, Inc.*, 618 F.3d at

3    1036 ("[T]echnical inadequacies in a survey, including the format of the questions or the manner

4    in which it was taken, bear on the weight of the evidence, not its admissibility.").

5            Finally, Defendants argue that Dr. Krock stated that a valid survey must not reveal that it is

6    being used for litigation.  MTS at 10.  However, as Dr. Peterson noted, "the survey methodology

7    textbook *Designing and Conducting Survey Research* states that during the initial phase of the

8    survey[,] 'it is important to inform potential respondents about the purpose of the study in order to

9    convey its importance and alleviate any concerns that potential respondents are likely to have.'"

10   Peterson Decl. ¶ 34.  In short, Defendants have not provided evidence establishing that Dr.

11   Peterson's report should be excluded.

12           Accordingly, Plaintiffs have established that their survey was conducted according to

13   accepted principles, and therefore, Defendants' arguments that there were "technical inadequacies

14   in a survey, including the format of the questions or the manner in which it was taken, bear on the

15   weight of the evidence, not its admissibility."  *Fortune Dynamic, Inc.*, 618 F.3d at 1036; *see also*

16   *Wendt*, 125 F.3d at 814 ("Challenges to survey methodology go to the weight given the survey,

17   not its admissibility."  ); *Southland Sod Farms,* 108 F.3d at 1143 n. 8 ("However, as long as they

18   are conducted according to accepted principles, survey evidence should ordinarily be found

19   sufficiently reliable under *Daubert.*" (quotation marks omitted)).  Indeed, "[w]hat [an expert] did

20   or didn't take into account in constructing his analysis may be grist for a good cross-examination

21   at trial, but they do not play a material role in deciding whether [the expert's] work should be

22   admitted under Rule 702."  *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (N.D. Cal.

23   Feb. 21, 2020) (quotation marks omitted).

24           As a result, the Court DENIES Defendants' motion to strike Dr. Peterson's report and the

25   underlying survey evidence.

26   **B.  Motion for Class Certification**

27           The Court next addresses the substance of Plaintiffs' motion for class certification.  To

28                                                              15

United States District Court
Northern District of California

1   obtain class certification, Plaintiffs bear the burden of showing that they have met each of the four

2   requirements of Rule 23(a) and at least one subsection of Rule 23(b).  *Zinser*, 253 F.3d at 1186.

3   The four requirements of Rule 23(a) are numerosity, commonality, typicality, and adequacy of

4   representation.  *Mazza*, 666 F.3d at 588.  Here, Plaintiffs must also "satisfy through evidentiary

5   proof" Rule 23(b)(3)'s requirements of predominance and superiority.  *See Comcast Corp.*, 569

6   U.S. at 33.

7          As explained above, Rule 23 does not set forth a mere pleading standard, and "[a] party

8   seeking class certification must affirmatively demonstrate . . . compliance with the Rule."  *Duke*,

9   564 U.S. at 350.  Put differently, "the district court must determine whether there was

10  'significant proof that [a defendant] operated under a general policy.'"  *Ellis v. Costco Wholesale*

11  *Corp.*, 657 F.3d 970, 983 (9th Cir. 2011) (quoting *Dukes*, 564 U.S. at 353).  At the same time,

12  though "a district court *must* consider the merits if they overlap with the [Rule 23] requirements,"

13  *id*. at 981 (emphasis in original) (citing *Dukes*, 564 U.S. at 351-52), "Rule 23 grants courts no

14  license to engage in free-ranging merits inquiries at the certification stage," *Amgen*, 568 U.S. at

15  466; *see id*. ("Merits questions may be considered to the extent—but only to the extent—that they

16  are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.").

17         Here, Defendants primarily argue that Plaintiffs do not satisfy the commonality and

18  predominance requirements.  Defendants, however, also marginally argue that Plaintiffs do not

19  satisfy the typicality and adequacy requirements.  The Court addresses each Rule 23(a) and Rule

20  23(b)(3) requirement and concludes that Plaintiffs have met their burden to certify their class.

21         **1.  Numerosity**

22         Pursuant to Rule 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder

23  of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  The parties agree that the proposed

24  class includes approximately 26,000 putative class members.  Numerosity is usually satisfied

25  where the class consists of 40 or more members.  *Twegbe v. Pharmaca Integrative Pharmacy,*

26  *Inc.*, 2013 WL 3802807, *3 (N.D. Cal. July 17, 2013) ("[T]he numerosity requirement is usually

27  satisfied where the class comprises 40 or more members, and generally not satisfied when the

28

United States District Court
Northern District of California

class comprises 21 or fewer members."); *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007) (noting same). Plaintiffs have met that bar here, and indeed, Defendants do not dispute that Plaintiffs satisfy Rule 23(a)(1)'s numerosity requirement.  The Court now addresses Rule 23(a)(2)'s commonality requirement.

### 2.  Commonality

Rule 23(a)(2) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if . . . there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). This requirement has "been construed permissively, and all questions of fact and law need not be common to satisfy the rule."  *Ellis*, 657 F.3d at 986 (9th Cir. 2011) (internal quotation marks and alteration omitted).  Indeed, "for purposes of Rule 23(a)(2), even a single common question will do."  *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted).

At the same time, the United State Supreme Court has cautioned that "any competently crafted class complaint literally raises common 'questions.'"  *Dukes*, 564 U.S. at 349 (internal citation omitted).  Therefore, what matters for class certification "is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Id*. at 350 (internal quotation marks omitted).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury."  *Id*. at 349-50.  It is not enough that the class members "have all suffered a violation of the same provision of law."  *Id*. at 350.

Furthermore, "[w]hether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised."  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014).  As explained previously, to establish classwide liability pursuant to Wage Order 7 and Section 2802, Plaintiffs must be able to provide common, classwide proof that (1) the clothing is required by an employer, (2) it is "of distinctive design or color," and (3) it is not "usual and generally usable in the occupation."  *See Wet Seal*, 210 Cal. App. 4th at 1359 ("Thus, in order to determine whether certain wardrobe items constitute

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

a 'uniform' within the meaning of subdivision 9(A) [of Wage Order 7], courts must consider whether the dress code policy requires wardrobe items that are usual and generally usable in the occupation and whether those items have a distinctive design or color." (quotation marks omitted)); *Townley*, 37 Cal. App. 5th at 185 (dismissing Section 2802 claim because plaintiff's counsel conceded that clothing purchases did not satisfy Wage Order 7's requirement that the clothing be "part of a 'uniform'" and "generally usable in the [restaurant] occupation"); *see also* Mot. at 18 n.8 ("Plaintiffs discussion here assumes, without conceding, that the elements of a section 2802 claim are the same as a claim under the Wage Order.").

Here, Plaintiffs argue that there are multiple common questions of law and fact.  First, Plaintiffs contend that whether putative class members were required to purchase clothing is a classwide question capable of common proof.  Specifically, Plaintiffs assert that Defendants' blue vest policy was never actually implemented such that Plaintiffs were in fact required to purchase clothing in order to satisfy Defendants' dress standards.  Mot. at 27-28.

Second, Plaintiffs argue that whether the clothing purchased by putative class members constitutes a "uniform" under Wage Order 7 is a classwide question capable of common proof.  In other words, Plaintiffs claim that Defendants' Team Color policy was implemented consistently across the class such that whether putative class members' clothing purchases were "of distinctive design and color" and were "usual and generally usable in the occupation" is capable of classwide resolution.  Reply at 3-8.

In support of these arguments, Plaintiffs point to Dr. Peterson's expert report and its underlying survey evidence, the November 2019 survey regarding blue vest availability, and Defendants' official written policies.  Plaintiffs claim that these pieces of evidence supply common, classwide methods of proof concerning Defendants' liability pursuant to Section 2802 and Wage Order 7.  As discussed more fully below, the Court agrees that Plaintiffs satisfy Rule 23(a)(2)'s commonality requirement.

     **a.  Whether Defendants Required Plaintiffs To Purchase Clothing Is A Classwide Question**

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1    First, Plaintiffs' evidence constitutes significant proof of a common question of whether

2    Plaintiffs were required to purchase clothing as a condition of their employment.  This question is

3    material because it "will drive the answer to the plaintiffs' claims on" the first element of

4    Plaintiffs' claims for reimbursement under Wage Order 7 and Section 2802.  Though Defendants'

5    official written policies explicitly permit employees to wear a blue vest as an alternative,

6    "Plaintiffs' theory is that Defendant has a common practice of not following its official policy, and

7    proving at trial whether Defendants' unofficial policy exists will drive the resolution of the claims

8    of all members of the Class."  Mot. at 28.  Plaintiffs have submitted substantial evidence of a

9    common practice of not providing employees with a blue vest, including a November 2019 survey

10   regarding blue vest availability.  That survey's results indicate that at least 337 of Defendants'

11   stores in California did not have any vests when surveyed, which suggests that the blue vest

12   alternative is not a real option for many employees.  As a result, employees would ostensibly need

13   to purchase their own clothing in order to come into compliance with Defendants' official written

14   policies regarding dress standards.

15   Moreover, Dr. Peterson's expert report and the underlying survey also establish that

16   whether employees were required to purchase clothing is a classwide question subject to common

17   proof.  Specifically, Dr. Peterson's expert report and the underlying survey noted that among other

18   things, only 6.1 percent of respondents thought they could wear a Rite Aid blue vest instead of a

19   blue shirt on a regular basis, and 30.6 percent of respondents said they saw a Rite Aid blue vest in

20   a store where they worked.  Peterson Decl. ¶ 3.  Because only 6.1 percent of respondents stated

21   that they thought they could wear a Rite Aid blue vest instead of a blue shirt on a regular basis, the

22   survey provides further evidence that putative class members were subject to a common policy

23   that required them to purchase clothing.  This evidence, coupled with the November 2019 survey

24   that indicates that at least 337 of Defendants' stores in California did not have blue vests available

25   for employee use, tends to show that the question of whether Plaintiffs and putative class members

26   are required to purchase clothing as a condition of employment is a common question.

27   **b.  Whether Defendants' Team Color Policy Constitutes A Uniform Under**

28
Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**California Law Is Another Classwide Question**

Furthermore, though "even a single common question will do" "for the purposes of Rule 23(a)(2)," *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted), Plaintiffs' evidence identifies another question common to the class.  In addition to the common question concerning whether Defendants required Plaintiffs to purchase clothing, whether Defendants' Team Colors policy is a uniform and violates California law is another classwide question.

To begin, Defendants' own official written policies require employees to wear navy blue tops and khaki bottoms pursuant to the Team Colors policy.  As explained previously, Defendants' Store Dress Standards state that employees must wear clothing consistent with Defendants' "Team Colors" of navy blue tops and khaki bottoms.  *See id.*; *see also* ECF No. 54 ("Robinson Decl."), Ex. 4 at 11 ("Rite Aid has adopted a contemporary 'Team Colors' approach for associates who interact with our customers.  Our signature navy blue and khaki Team Colors look focuses on comfort, team unity, and helps to project a friendly, neighborhood environment in our stores . . . .").

Defendants' Handbook devotes an entire section to "Team Colors" and provides that "Team Colors attire is mandatory in our store environment."  Robinson Decl., Ex. 4 at 11.  That official written document also explains that "[a]ssociates who report to work inappropriately . . . dressed may be asked to leave and change into acceptable clothing or to otherwise correct the violation.  In such instances, the time away from work may be without pay."  *Id.* at 12.

Furthermore, Defendants' written company policy charges store managers and field leaders to communicate and enforce dress standards.  Ceballos Decl., Ex. B at 1 ("Store and Pharmacy Managers along with Field Leaders will primarily be responsible for monitoring and enforcing this policy.").  As Defendants' own corporate representative noted, Defendants' New Hire Orientation kit is intended to be reviewed by management with every new employee, Ceballos Dep. 38:9–40:7, and the New Hire Orientation kit also admonishes employees to "remember to wear your name badge and dress in Team Colors during working hours," Robinson Decl., Ex. 10 at 2.

Moreover, Plaintiffs provide other significant evidence that store managers and supervisors

20

communicate these written policies to employees across the class.  Specifically, Dr. Peterson's expert report and the underlying survey noted that 100 percent of respondents said they were required to wear a navy-blue shirt, 98.0 percent of respondents said they were required to wear khaki-colored pants, 95.9 percent of respondents said they purchased a navy-blue shirt to comply with the dress code, and 91.8 percent of respondents said they purchased khaki-colored pants to comply with the dress code.  Peterson Decl. ¶ 3.  This evidence is consistent with the proposition that Defendants have their store managers and supervisors accurately enforce the official written policies regarding Team Colors.  Accordingly, determining whether Defendants' Team Colors policy constitutes a uniform pursuant to Wage Order 7 and Section 2802 is a common, classwide question.

Defendants' only response is that numerous declarations from Rite Aid employees show that individual store managers and supervisors had discretion in implementing Defendants' official written policies such that there was no common dress standard communicated across the entire class.  Opp. at 15–22.  To be sure, Defendants' proffered declarations do note that some store managers and supervisors allowed employees to wear clothing that was not fully compliant with Defendants' written policies.

Nonetheless, even these declarations show how store managers and supervisors generally enforced Defendants' written official policies across the class.  In particular, declarants consistently noted that Defendants' dress standard was blue shirts and khaki pants.  Though that policy was enforced differently on the margins—for example, jeans of a khaki color were sometimes permitted, or different shades of blue or even black were allowed by some store managers and supervisors—Defendants' employee declarations consistently state that Defendants' official dress code policies required blue tops and khaki bottoms.  *See, e.g.*, Alexander Decl. ¶ 4–7 (describing dress standards as blue and khaki); Macintosh Decl. ¶ 5 ("Employees in my store are encouraged to wear navy blue tops and brown or khaki pants unless they are wearing a Rite Aid vest."); Luna Decl. ¶ 4 ("My understanding of Rite Aid's team colors is blue and beige or khaki."); Attanasio Decl. ¶ 5 ("My understanding of the store dress standards of dark blue shirts

21

1   and khaki bottoms."); Siatunuu Decl. ¶ 6 ("I also had verbal conversations with [associates] about

2   the new team colors approach.  I told them to wear navy blue and khaki.").

3          As a result, the Court "rejects Defendants' reliance on evidence of minor variations in how

4   . . . policies were implemented at different facilities."  *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D.

5   247, 269 (N.D. Cal. 2018).  The fact of the matter is that Plaintiffs have identified official written

6   policies regarding dress standards and that those policies directed store managers and supervisors

7   to implement and enforce the written dress standards.  Additionally, survey evidence indicates that

8   these policies were communicated consistently across the class such that 100 percent of

9   respondents said they were required to wear a navy-blue shirt, 98.0 percent of respondents said

10  they were required to wear khaki-colored pants, 95.9 percent of respondents said they purchased a

11  navy-blue shirt to comply with the dress code, and 91.8 percent of respondents said they

12  purchased khaki-colored pants to comply with the dress code.  Peterson Decl. ¶ 3.  Accordingly,

13  the Court holds that whether Defendants' dress code constitutes a uniform under Wage Order 7

14  and Section 2802 is another question capable of classwide resolution.

15         Many courts have reached a similar conclusion.  *Sevilla v. Aaron's, Inc.*, 2019 WL

16  2879874, at *12 (C.D. Cal. Mar. 25, 2019) ("The question of whether logoed apparel qualifies as a

17  necessary expense under section 2802 is a factual question common to all members of the

18  Business Expense Reimbursement Subclass.  Its answer will 'drive resolution of the action in one

19  stroke,' whether in favor of Plaintiff or Defendant." (citation omitted)); *Greer v. Dick's Sporting*

20  *Goods, Inc.*, , 2017 WL 1354568, at *12 (E.D. Cal. Apr. 13, 2017) ("[Defendant] instituted a

21  'Look Policy' that dictated what employees may wear. . . . Moreover, although the policy may not

22  have been expressly required, [Defendant] maintained a de facto policy by explaining that

23  compliance was 'extremely important' and that non-compliance was a basis for

24  dismissal. . . .  These common, underlying policies provide common proof relevant to classwide

25  resolution, and these common questions predominate over any individual inquiry to which

26  [Defendant] points.").

27         For example, in *Brown v. Abercrombie & Fitch Co.*, the plaintiffs brought a putative class

28

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1    action alleging that the defendants coerced or compelled employees to purchase clothing in

2    violation of California law.  2015 WL 9690357, at *10 (C.D. Cal. July 16, 2015).  The *Brown*

3    plaintiffs argued that "despite Defendants' formal written policy of not requiring employees to

4    purchase or wear Abercrombie clothes, managers coerce store employees to purchase

5    Abercrombie clothing."  *Id.* at 11.

6         The *Brown* court certified the class and concluded that the plaintiffs had satisfied Rule

7    23(a)(2)'s commonality requirement.  Specifically, "Abercrombie's written 'Look Policy,' which

8    dictates what an employee may wear while working," constituted "evidence of a common practice

9    or informal policy of pressuring employees to purchase Abercrombie clothing."  *Id.* at 12.  This

10   Look Policy was explained at the orientation for all new associates.  *Id.*  Additionally, "and

11   perhaps most importantly, Plaintiffs point to various communications among Abercrombie

12   management regarding the importance of 'pushing' or 'driving' sales of AAA clothing items to

13   employees."  *Id.*

14        The same is true in the instant case.  Here, Defendants' written official policy requires

15   employees to wear navy blue tops and khaki bottoms and compels store managers and supervisors

16   to explain the policy to all new associates and to implement and enforce the policy.  Furthermore,

17   as in *Brown*, Plaintiffs here point to evidence—in the instant case, Dr. Peterson's expert report and

18   the underlying survey evidence—that Defendants actually required putative class members to

19   purchase clothing that conformed with Defendants' official written policy.  *See* Peterson Decl. ¶ 3.

20        Thus, Plaintiffs "have not merely provided anecdotal evidence of individual experiences

21   but have set forth at least some evidence of a broader, company-wide policy that was disseminated

22   downward from top management to store associates."  *Brown*, 2015 WL 9690357, at *13.  This

23   fact distinguishes the instant case from *Morgan v. Wet Seal*, 210 Cal. App 4th 1341 (2012), a case

24   upon which Defendants heavily rely.  Opp. at 19–20.

25        In *Wet Seal*, the plaintiffs merely submitted several emails from a single district director.

26   210 Cal. App. 4th at 1351–52.  Here, Plaintiffs submit not only Defendants' own written official

27   policies regarding dress standards; rather, Plaintiffs proffer survey evidence that indicates

28

23

Defendants communicated a consistent policy across the class requiring employees to purchase clothing in compliance with Defendants' written dress standards. "Thus, while the plaintiffs in *Wet Seal* failed to adequately evidence a common policy or practice, Plaintiffs here have supported their assertion that such a common practice or informal policy may exist (and proving the existence of that policy or practice at trial won't depend wholly on individual testimony." *Brown*, 2015 WL 9690357, at *13; *Greer v. Dick's Sporting Goods, Inc.*, 2017 WL 1354568, at *12 (E.D. Cal. Apr. 13, 2017) (distinguishing *Wet Seal* on a similar basis).

Accordingly, the Court concludes that Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement. The Court next addresses whether Plaintiffs satisfy Rule 23(b)(3)'s predominance requirement.

### 3. Predominance

Rule 23(b)(3)'s predominance requirement asks whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In other words, the "Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance inquiry is "far more demanding" than the commonality test under Rule 23(a)(2). *Id.* at 624.

Specifically, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). To meet the predominance requirement, "common questions must be a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014). For the purposes of Rule 23, a "common" question is one that is "capable of classwide resolution." *Dukes*, 564 U.S. at 350. In contrast, an "individual" question is one for which "members of a proposed class will need to present evidence that varies from member to member." *Tyson Foods*, 136 S. Ct. at 1045 (quotation marks omitted).

"Predominance is not, however, a matter of nose-counting." *Torres v. Mercer Canyons*

24

United States District Court
Northern District of California

1    *Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (citing *Jimenez*, 765 F.3d at 1165).  "Rather, more

2    important questions apt to drive the resolution of the litigation are given more weight in the

3    predominance analysis over individualized questions which are of considerably less significance

4    to the claims of the class."  *Id*.  Indeed, "Rule 23(b)(3) . . . does *not* require a plaintiff seeking

5    class certification to prove each element of her claim is susceptible to classwide proof.  What the

6    rule does require is that common questions *predominate* over any questions affecting only

7    individual class members."  *Amgen*, 568 U.S. at 469 (quotation marks, citations, and internal

8    alterations omitted).

9         Put differently, "[w]here, after adjudication of the classwide issues, plaintiffs must still

10   introduce a great deal of individualized proof or argue a number of individualized legal points to

11   establish most or all of the elements of their individual claims, such claims are not suitable for

12   class certification under Rule 23(b)(3)."  *Sonner v. Schwabe N. Am., Inc.*, 2019 WL 4266808, at

13   *6 (C.D. Cal. July 2, 2019) (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004));

14   *Quesada v. Banc of Am. Inv. Servs., Inc.*, 2013 WL 623288, at *5 (N.D. Cal. Feb. 19, 2013)

15   (same); *Vasquez v. Leprino Foods Co.*, 2020 WL 1527922, at *13 (E.D. Cal. Mar. 31, 2020)

16   ("[C]ommon issues likely will not predominate if a great deal of individualized proof would need

17   to be introduced to address most or all of the elements of a claim, or a number of individualized

18   legal points would need to be established after common questions were resolved, or the resolution

19   of an overarching common issue breaks down into an unmanageable variety of individual legal

20   and factual issues." (quotation marks, citations, and internal alterations omitted)).

21        Courts are thus required "to take a 'close look' at whether common questions predominate

22   over individual ones," *Comcast*, 569 U.S. at 34 (citation omitted), "begin[ning] . . .  with the

23   elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S.

24   804, 809 (2011).  Of course, plaintiffs need not show at the certification threshold that

25   predominant questions will be answered in their favor.  *Amgen*, 568 U.S. at 468.

26        Here, Plaintiffs have established that common questions predominate over individual ones.

27   To state a claim for clothing reimbursement under Wage Order 7 and Section 2802, the clothing

28

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1   must be (1) required by an employer, (2) "of distinctive design or color," and (3) not "usual and

2   generally usable in the occupation." *See Wet Seal*, 210 Cal. App. 4th at 1359.  As noted above, the

3   Court found that Plaintiffs had provided significant proof of common questions regarding (1)

4   whether Defendants required Plaintiffs to purchase clothing as a condition of employment, and (2)

5   whether Plaintiffs had to purchase specific clothing that could constitute a uniform under

6   California law.  Defendants' official written policies, the November 2019 survey regarding blue

7   vest availability, and Dr. Peterson's expert report and underlying survey demonstrate that whether

8   a common policy was communicated across all class members is capable of classwide resolution.

9       Importantly, these common questions are not merely peripheral, but rather, go directly to

10   liability on a classwide basis because they are capable of answering whether the clothing was

11   (1) required by an employer, (2) "of distinctive design or color," and (3) not "usual and generally

12   usable in the occupation." *See Wet Seal*, 210 Cal. App. 4th at 1359.  Indeed, "more important

13   questions apt to drive the resolution of the litigation are given more weight in the predominance

14   analysis." *Torres*, 835 F.3d at 1134.  In other words, common questions predominate because

15   "after adjudication of classwide issues," Plaintiffs would not have to "introduce a great deal of

16   individualized proof or argue a number of individualized legal points to establish most or all of the

17   elements of their individual claims. *Sonner*, 2019 WL 4266808, at *6 (quotation marks omitted).

18       Defendants again point to their declarations from employees that state that Defendants'

19   written policies were sometimes enforced differently depending on individual store managers and

20   supervisors' preferences.  However, as explained previously, "Plaintiffs do not merely rely on the

21   perceptions of individual employees and potentially atypical oral instructions from managers."

22   *Brown*, 2015 WL 9690357, at *18.  Rather, Plaintiffs' proof includes Defendants' own official

23   written policies and surveys and reports evidencing that Defendants' official written policies were

24   largely implemented and communicated on a consistent basis across the class.  Thus, where

25   "Plaintiffs have presented evidence of a company-wide policy or practice," even small variations

26   regarding "how that policy or practice was conveyed to employees, and the fact that some

27   employees may not have actually succumbed to the pressure exerted upon them . . . do not

28

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

*United States District Court*
*Northern District of California*

1    necessarily defeat class certification." *Id.*; *see Shaw.*, 326 F.R.D. at 269 (rejecting "Defendants'

2    reliance on evidence of minor variations in how . . . policies were implemented at different

3    facilities" and "find[ing] that common issues predominate over individualized inquiries").

4            Defendants raise two more predominance arguments, both of which the Court rejects.

5    First, Defendants claim that predominance is not satisfied as to Plaintiffs' derivative wage claims.

6    Opp. at 23–25.  Specifically, Defendants claim that individualized issues regarding store

7    managers' enforcement of Team Colors and individual employees' wages would overwhelm any

8    common issues.  As the Court concluded, however, whether Defendants implemented and

9    communicated a common dress code policy across the class and failed to reimburse employees for

10   clothing purchases made pursuant to that policy are common, classwide questions.  Additionally,

11   because "reimbursements for uniform expenses are wages," "[a]n employee who has ostensibly

12   been paid the minimum wage but has been required to make an expenditure which reduces the

13   employee's net income below the minimum wage is, in essence, in the same position as an

14   employee who was paid less than the minimum wage at the outset." *Sanchez*, 2013 WL 1942166,

15   at *10, 13.  In other words, the existence and enforcement of Defendants' Team Colors policy

16   would have a direct bearing on Defendants' liability pursuant to Plaintiffs' derivative claims,

17   which weighs heavily in favor of finding predominance. *See Torres*, 835 F.3d at 1134 ("[M]ore

18   important questions apt to drive the resolution of the litigation are given more weight in the

19   predominance analysis.").  Therefore, Plaintiffs have identified common questions that would

20   drive the resolution of Plaintiffs derivative wage claims such that common issues predominate

21   over individualized inquiries.

22           Second, Defendants assert that Plaintiffs fail to establish a trial plan, which Defendants

23   assert is problematic for calculating individualized damages.  Opp. at 25 (citing *Tyson Foods, Inc.*

24   *v. Bouaphakeo*, 136 S. Ct. 1036 (2016)).  Rule 23, however, does not require a plaintiff to offer a

25   trial plan to certify a class, and the Ninth Circuit has explicitly declined to "graft[] a requirement

26   for a trial plan onto [Rule 23]." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 961 n.4 (9th Cir.

27   2005); *see also, e.g.*, *Lao v. H&M Hennes & Mauritz, L.P.*, 2019 WL 7312623, at *7 (N.D. Cal.

28

United States District Court
Northern District of California

27

Dec. 30, 2019) (same); *United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. Jul. 30, 2018), *leave to appeal denied sub nom. United States v. Wasatch Advantage Grp., LLC*, No. 18-80091, 2018 WL 6118456 (9th Cir. Oct. 17, 2018) (same); *Martino v. Ecolab, Inc.*, 2016 WL 614477, at *10 (N.D. Cal. Feb. 16, 2016) (same).  Indeed, this Court has previously observed "that no formal trial plan is required by Rule 23."  *See Dunbar v. Google, Inc.*, 2012 WL 6202797, at *21 n.4 (N.D. Cal. 2012); *see also In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 374 (N.D. Cal. 2018), *leave to appeal denied sub nom. Reyna v. Arris Int'l PLC*, No. 18-80099, 2018 WL 6167340 (9th Cir. Nov. 8, 2018) (same).

Additionally, and just as importantly, "[t]ime and time again, [the Ninth Circuit] has reaffirmed the principle that the need for individual damages calculations does not doom a class action" and that "[t]he Supreme Court's ruling in *Tyson Foods* has not disturbed [this] precedent." *Ridgeway v. Walmart*, 946 F.3d 1066, 1086 (9th Cir. 2020) (quotation marks omitted) (collecting cases).

Finally, in any event, Plaintiffs have "submitted a viable method for managing this case as a class action" because "common proof can be used to determine Defendant[s]' liability" and "Plaintiff[s] plan[] to use statistical evidence, including surveys or representative testimony, or both, of class members to determine damages at trial."  *Sullivan v. Kelly Servs., Inc.*, 268 F.R.D. 356, 365 (N.D. Cal. 2010).  "This type of evidence is commonly accepted by courts for calculating damages in large class actions."  *Id.* (collecting cases).  Therefore, the Court rejects Defendants' argument regarding a trial plan and individualized damages.

Accordingly, the Court concludes that in the instant case, "common, aggregation-enabling, issues . . . are more prevalent or important than [any] non-common, aggregation-defeating, individual issues." *Tyson Foods*, 136 S. Ct. at 1045 (2016).  As a result, Plaintiffs have demonstrated that common issues predominate over individualized inquiries.  The Court now turns to the Rule 23(a)(3)'s typicality requirement.

### 4.  Typicality

Under Rule 23(a)(3), a representative party must have claims or defenses that are "typical

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (citations omitted).  This requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998).  "Defenses unique to a class representative counsel against class certification only where they threaten to become the focus of the litigation." *Rodriguez*, 591 F.3d at 1124.  "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Plaintiffs argue that Nucci, Goswick, and Shaw are typical plaintiffs because they were subjected to the Team Colors policy and were required to wear and purchase navy blue tops and khaki bottoms.  Mot at 25.  Plaintiffs argue that Defendants' written Team Colors policy is evidence that Defendants had an official policy or practice regarding dress standards and that the survey evidence indicates that in practice, Defendants required putative class members to abide by Defendants' Team Colors policy and wear and purchase navy blue tops and khaki bottoms.  *Id*. at 26.

Defendants conclusorily respond that Nucci, Goswick, and Shaw are not typical of the class because other employees may have chosen to purchase and wear navy blue tops and khaki bottoms for a number of different reasons and that sometimes, employees were to wear non-Team Colors clothing to work.  Opp. at 22-23.  The Court disagrees with Defendants and concludes that Plaintiffs satisfy the typicality requirement.

"Merely because a named plaintiff's experience varied somewhat from that of each class member, their claims are not necessarily atypical if they were subject to a common practice or policy." *Brown*, 2015 WL 9690357, at *15.  "[V]ariations among facilities are not inconsistent with Plaintiffs' theory" that Defendants' official written policies were put into practice by store managers and supervisors.  *Shaw v. AMN Healthcare, Inc.*, 326 F.R.D. 247, 273 (N.D. Cal. 2018).

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1    Indeed, Defendants' own employee declarations consistently explain that Defendants' dress code

2    involves some iteration of blue tops and khaki bottoms.

3           Moreover, though Defendants' employee declarations state that they were sometimes

4    permitted to wear non-Team Colors clothing to work, no declaration states that a significant

5    number of employees were *never* required to wear Team Colors-compliant clothing to work.

6    Indeed, Defendants' declarations appear to note that employees were largely allowed to wear non-

7    compliant clothing on a mostly occasional basis.  *See, e.g.*, ECF No. 57-6, Ex. 17 ("Alexander

8    Decl.") ¶ 14 ("I have seen hourly associates come to work in jeans or black pants.  In those

9    instances, the associates typically call me in advance and say their khakis are being washed and

10   won't be dry in time for work.  It is not a problem for me if associates wear jeans or black pants on

11   occasion."); Manning Decl. ¶ 15 ("I have seen Rite Aid employees wear jeans and black pants to

12   work, but not often."); ECF No. 57-6, Ex. 26 ("Castro Decl.") ¶ 10 ("I allow associates to wear

13   non-blue jackets or sweatshirts when it is cold in the store.").

14          This is important because unless a store manager or supervisor *never* enforced Defendants'

15   Team Colors policy, class members would still have to, at some point, come into compliance with

16   Defendants' common policy to purchase and wear compliant clothing as a condition of their

17   employment.  Defendants have provided no evidence that their store managers or supervisors

18   never enforced Defendants' Team Colors policy, and as such, the minor variations in enforcement

19   across stores is not enough to defeat typicality in light of Defendants' common policy and

20   practice.  *See, e.g., Kamar v. Radio Shack Corp.*, 254 F.R.D. 387, 396 (C.D. Cal. 2008) ("Given

21   the common policy, the fact that there have been variations in meetings attended, scheduled shifts,

22   and actual hours of work does not defeat typicality."); *Brown*, 2015 WL 9690357, at *15 ("Merely

23   because a named plaintiff's experience varied somewhat from that of each class member, their

24   claims are not necessarily atypical if they were subject to a common practice or policy."); *Novoa

25   v. GEO Grp., Inc.*, 2019 WL 7195331, at *13 (C.D. Cal. Nov. 26, 2019) ("Although their

26   situations were not identical, they all have the same theory of injury, which if proven, could

27   establish their California wage law, unfair competition, and unjust enrichment claims.").

28
Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

United States District Court
Northern District of California

1    As a result, the Court concludes Plaintiffs' claims are typical of the class.  The Court now

2    analyzes whether Plaintiffs have satisfied the adequacy requirement.

3        **5.  Adequacy**

4        Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the

5    interests of the class."  Fed. R. Civ. P. 23(a)(4).  In the Ninth Circuit, to test the adequacy of a

6    class representative, a court must answer two questions: "(1) do the named plaintiffs and their

7    counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs

8    and their counsel prosecute the action vigorously on behalf of the class?"  *Staton v. Boeing Co.*,

9    327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020).

10       Defendants first argue that Plaintiffs cannot adequately protect the interests of the class

11   because non-exempt managers are included in the class.  Opp. at 23.  According to Defendants,

12   this constitutes a conflict of interest because store managers were responsible for implementing

13   Defendants' official written policies.  *Id.*  The Court disagrees.

14       "[C]lass representatives fail to meet the adequacy standard when the 'conflicts between the

15   class members are serious and irreconcilable."  *Kempen v. Matheson Tri-Gas, Inc.*, 2016 WL

16   4073336, at *6 (N.D. Cal. Aug. 1, 2016) (quoting *Breeden v. Benchmark Lending Grp., Inc.*, 229

17   F.R.D. 623, 629 (N.D. Cal. 2005)).  Any conflicts between Plaintiffs and class members are not

18   "serious and irreconcilable" because Plaintiffs' primary interests, like class members' interests, are

19   in proving that Defendants' written policies are unlawful.  As numerous courts have concluded,

20   "[s]imply because the team managers implemented [Defendants'] allegedly unlawful policies does

21   not mean" that there is a conflict of interest because "[t]here is no indication that Plaintiffs are

22   placing legal blame on the team managers' shoulders."  *Vasquez v. Leprino Foods Co.*, 2020 WL

23   1527922, at *111 (E.D. Cal. Mar. 31, 2020) (collecting cases).  Indeed, as this Court has held,

24   courts typically find a conflict of interest where "plaintiffs assigned 'partial responsibility for

25   [illegal action] to their supervisors, and simultaneously sought to represent said supervisors."

26   *Delgado v. Marketsource, Inc.*, 2018 WL 6706041, at *8 (N.D. Cal. Dec. 20, 2018) (quoting

27   *Hughes v. WinCo Foods*, 2012 WL 34483, at *7 (C.D. Cal. Jan. 4, 2012).

28
31

1    When, on the other hand, "Plaintiffs . . . advanc[e] claims that attack [Defendants']

2    [common] policies, and those policies allegedly violated the team managers' . . . rights in the same

3    way that they affected the rights of Plaintiffs and the rest of the class," Plaintiffs do not have a

4    conflict of interest with managers or supervisors.  *Vasquez*, 2020 WL 1527922, at *11; *see also*

5    *Schuyler v. Morton's of Chicago, Inc.*, 2011 WL 13274238, at *5 (C.D. Cal. June 13, 2011) ("This

6    potential conflict of interest within the class does not touch upon the subject matter of this case

7    because Plaintiff is contending that it is Defendant, not the individual General Managers, that set

8    all policies, procedures, and standards with regard to employee exemption classification.

9    Specifically, the crux of Plaintiffs' argument is that he performed the same tasks and

10   responsibilities as all of the putative class members according to company policy and procedures.

11   As such, the Court finds that the conflict that may exist does not render Plaintiff inadequate

12   because the conflict, if any, is minimal, and the adequacy requirement, therefore, has been met."

13   (citations omitted)); *Perez v. Wells Fargo & Co.*, 2016 WL 4180190, at *8 (N.D. Cal. Aug. 8,

14   2016) (holding that Plaintiff satisfied adequacy because "she suffered the same injury as that

15   purportedly suffered by the putative members of the class," notwithstanding Defendants' argument

16   that class representatives' interests "conflict with putative class members, who, as management-

17   level employees, may have caused the issues about which [named plaintiff] now complains").  As

18   a result, Defendants' first adequacy argument fails.

19   Defendants' remaining adequacy argument centers on the assertion that Goswick was

20   solicited for the class action and is therefore an inadequate representative.  Opp. at 23.  There is,

21   however, "nothing unethical about solicitation in class action cases per se; only when the

22   solicitation violates ethical rules will it preclude a finding of adequacy."  *English v. Apple Inc.*,

23   2016 WL 1188200, at *13 n.16 (N.D. Cal. Jan. 5, 2016) (quoting Newberg on Class Action § 3:78

24   (5th ed.)); *see also Zaklit v. Nationstar Mortg. LLC*, 2017 WL 3174901, at *14 (C.D. Cal. July 24,

25   2017) ("Even assuming that plaintiffs were solicited by counsel, that does not undermine a finding

26   of adequacy.  There is nothing inherently improper with the recruitment of class representatives."

27   (citations omitted)); *Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *7 (S.D. Cal.

28

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

United States District Court
Northern District of California

1    Nov. 29, 2018) (same) (collecting cases).  Here, Defendants provide no evidence that Goswick or

2    class counsel violated an ethical rules, and accordingly, the Court rejects Defendants' argument.

3        As a result, the Court holds that Plaintiffs have satisfied Rule 23(a)(4)'s adequacy

4    requirement.  The Court concludes its analysis with Rule 23(b)(3)'s superiority requirement.

5        **6.  Superiority**

6        Rule 23(b)(3) provides four factors that a court must consider in determining whether a

7    class action is superior to other methods of adjudication.  These factors are:

8        (A) the class members' interests in individually controlling the prosecution or
          defense of separate actions;
9        (B) the extent and nature of any litigation concerning the controversy already begun
          by or against class members;
10       (C) the desirability or undesirability of concentrating the litigation of the claims in
          the particular forum; and
11       (D) the likely difficulties in managing a class action.

12   Fed. R. Civ. P. 23(b)(3).  "[T]he purpose of the superiority requirement is to assure that the class is

13   the most efficient and effective means of resolving the controversy."  *Wolin v. Jaguar Land Rover*

14   *N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7A Charles Wright, Arthur Miller &

15   Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed. 2005)).  "In cases in which

16   plaintiffs seek to recover relatively small sums and the disparity between litigation costs and the

17   recovery sought may render plaintiffs unable to proceed individually, 'class actions may permit

18   the plaintiffs to pool claims which would be uneconomical to bring individually.'"  *Moore v. Ulta*

19   *Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622 (C.D. Cal. 2015) (quoting *Local Joint*

20   *Executive Bd. Of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th

21   Cir. 2001)).

22       Defendants do not contest that Plaintiffs satisfy the superiority requirement.  Additionally,

23   the Court concludes that Plaintiffs have satisfied all four superiority factors.  First, the Ninth

24   Circuit has observed that "[w]here damages suffered by each putative class member are not large,"

25   the "interest of each member in individually controlling the prosecution or defense of separate

26   actions . . . weighs in favor of certifying a class action."  *Zinser*, 253 F.3d at 1190 (internal

27   quotation marks omitted).  Such is the case here.  The first factor thus weighs in favor of

28

United States District Court
Northern District of California

33

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

1   certification.

2        Second, regarding "the extent and nature of any [other] litigation concerning the

3   controversy, the Court is not aware of any other actions against Defendant related to the claims at

4   issue in the instant case." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. at 374.  Thus, the

5   second factor also weighs in favor of certification.  *Id.*

6        Third, the desirability of concentrating the litigation in a particular forum, also militates in

7   favor of granting certification.  Concentrating litigation in this district is desirable because the

8   challenge is under California law and the proposed class is composed of California employees.

9   *See McKenzie v. Fed. Exp. Corp.*, 275 F.R.D. 290, 302 (C.D. Cal. 2011) ("Here, there is no reason

10  to believe that concentrating this action in this Court is undesirable, especially considering that the

11  challenge is under California law, and the proposed class is composed of only hourly employees in

12  California.").

13       Finally, the fourth factor, which concerns the difficulty of managing a class action,

14  depends largely on whether Plaintiffs' case "rises and falls [on] common evidence."  *In re High-*

15  *Tech Emp. Antitrust Litig.*, 985 F.Supp.2d 1167, 1228 (N.D. Cal. 2013).  This factor overlaps with

16  the Court's commonality, typicality, and predominance analysis.  Therefore, the Court finds that

17  the fourth factor weighs in favor of certification.

18       Overall, after weighing the four superiority factors, the Court concludes that Plaintiffs have

19  satisfied Rule 23(b)(3)'s superiority requirement.  Thus, because the Court finds that Rule 23(a)

20  and Rule 23(b)(3) have been satisfied, the Court GRANTS Plaintiffs' motion for class

21  certification.

22  **IV.   CONCLUSION**

23       For the foregoing reasons, the Court DENIES Defendants' motion to strike and GRANTS

24  Plaintiffs' motion for class certification.  Plaintiffs have satisfied the requirements of Rule 23(a)

25  and Rule 23(b)(3), and the Court CERTIFIES the following Rule 23(b)(3) class: All non-exempt

26  employees, excluding pharmacists, pharmacy interns, and asset protection agents, working in any

27  Rite Aid store in California at any time from March 13, 2015 through the trial date.

28

United States District Court
Northern District of California

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION

1

**IT IS SO ORDERED.**

2

Dated: June 14, 2020

3

4

LUCY H. KOH
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Case No. 19-CV-01434-LHK
ORDER DENYING MOTION TO STRIKE AND GRANTING CLASS CERTIFICATION