JONATHAN ALLAN KLEIN (SBN 162071)
THOMAS K. HOCKEL (SBN 172367)
SWETA H. PATEL (SBN 247115)
KLEIN, HOCKEL, IEZZA & PATEL P.C.
1981 North Broadway, Suite 220
Walnut Creek, CA 94596
Tel.: (415) 951-0535
Fax: (415) 391-7808

Attorneys for Defendants
RITE AID CORPORATION and
THRIFTY PAYLESS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTAL NUCCI and KELLY SHAW, individually and on behalf of others similarly situated and the California Labor & Workforce Development Agency, and ANA GOSWICK, individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>RITE AID CORPORATION, THRIFTY PAYLESS, INC. and DOES 1-10 inclusive,<br><br>Defendants. | Case No.: 5:19-cv-01434-LHK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Action Filed: March 19, 2019<br><br>Hearing Date: August 26, 2021<br>Time: 1:30 p.m.<br>Dept.: 8, 4th Floor, San Jose<br>Judge: Hon. Lucy H. Koh |

1

## TABLE OF CONTENTS

2  TABLE OF AUTHORITIES ..................................................................................................iii

3  NOTICE OF MOTION AND MOTION ................................................................................. 1

4  MEMORANDUM OF POINTS AND AUTHORITIES........................................................ 2

5  I. INTRODUCTION ............................................................................................................... 2

6  II. STATEMENT OF FACTS................................................................................................. 3

7     A.  Plaintiffs and Class Members ...................................................................................... 3

8     B.  Rite Aid's Team Colors Dress Code............................................................................ 3

9  III. LEGAL STANDARD...................................................................................................... 4

10     A.  Legal Standard for Summary Judgment or Partial Summary Judgment............................ 4

11     B.  Plaintiffs Must Satisfy All Three Elements of a Three-Part Test to Establish the Existence

12         of Reimbursable Uniform Expenses .......................................................................... 4

13     C.  Rite Aid's Requirement of Khaki Pants or Skirts Was Not a Reimbursable Uniform

14         Because Khaki is not a "Distinctive Color" ................................................................ 5

15        **1. The Plain Meaning of the Word "Khaki" Shows It Is Not a Distinctive Color ....... 5**

16        2. The Usage and Understanding of "Khaki" within the Fashion and Apparel Industry

17           Shows It Is Not a Distinctive Color ................................................................... 6

18        3. Rite Aid's Own Use of the Word "Khaki" Shows It Is Not a "Distinctive" Color ........ 7

19        4. Rite Aid Associates Understood Khaki to Include Various Shades and Colors............. 7

20     D.  Khaki-Colored Pants Are a Common Wardrobe Item......................................... 11

21     E.  Khaki-Colored Pants Are "Generally Usable" within the Occupation............................. 12

22     F.  Navy Blue Tops Are Not a Uniform Because They Are Not Distinctive ......................... 14

23     G.  Navy Blue Tops Are Common Wardrobe Items.................................................. 17

24     H.  Navy Blue Tops Are "Generally Usable" within the Occupation ................................. 18

25     I.  The "Blockbuster Case" Is Completely Inapposite ........................................... 19

26     J.  Plaintiffs' Derivative Claims Fail as a Matter of Law and Should be Dismissed ............. 21

27     K.  Failure to Reimburse for a Business Expense Cannot Result in Minimum Wage Violation

28         .................................................................................................................... 21

L.  Plaintiffs' Derivative Wage Statement Claims Fail Because Rite Aid's Wage Statements Were Accurate, and There Was No "Hourly Rate in Effect" Based on Reimbursement for Uniform Expenses .......................................................................................................... 23

**IV. CONCLUSION ................................................................................................................. 25**

## TABLE OF AUTHORITIES

**Cases**

*Becerra v. Radio Shack Corp.*, No. 4:11-CV-03586YGR, 2012 WL 6115627, *3, *5 (N.D. Cal. Dec. 10, 2012).................................................................................................................. 5, 10

*Brown v. Abercrombie & Fitch Co.,* No. CV141242JGBVBKX, 2015 WL 9690357 (C.D. Cal. July 16, 2015)........................................................................................................................ 5

*Department of Industrial Relations ("DIR"), Division of Labor Standards Enforcement ("DLSE") v. U.I. Video*, 55 Cal. App. 4th 1084, 1090-97 (1997) ..................................... 19, 20

*Garcia v. Wal-Mart Stores, Inc.*, No. CV-1601645-BRORAO, 2017 WL 10402969, at *6 (C.D. Cal. Apr. 6, 2017) ......................................................................................................... 21

*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554, 572 (2007).............................. 1, 22, 23

*In re Work Unif. Cases*, 133 Cal. App. 4th 328 (2005) ............................................................. 22

*J & J Sports Prods., Inc. v. Flores*, No. 1:10-CV-02087-AWI, 2013 WL 3456970, at *4 (E.D. Cal. July 9, 2013) ....................................................................................................... 21

*Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 673, 680, 681, 682 (9th Cir. 2021). . 1, 23, 24, 25

*Morales v. Bridgestone Retail Operations, LLC*, No. G057043, 2020 WL 1164120, at *1 (Cal. Ct. App. Mar. 11, 2020)........................................................................................................ 24

*Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 582 (2000), as modified (May 10, 2000) ...... 20

*Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284 (2007) .................................................................................................................. 10

*Nelson v. Dollar Tree Stores, Inc.*, No. 2:11-CV-01334 JAM, 2011 WL 3568498, at *3, *5 (E.D. Cal. Aug. 15, 2011) ................................................................................................... 22

*Perez v. DNC Parks & Resorts at Sequoia*, No. 119CV00484DADSAB, 2020 WL 4344911, at *10 (E.D. Cal. July 29, 2020) .............................................................................................. 11

*Price v. Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142 (2011)................................................. 25

*S. California Pizza Co., LLC v. Certain Underwriters at Lloyd's, London etc.*, 40 Cal. App. 5th 140, 151 (2019) ................................................................................................................... 22

*Sampson v. Parking Service 2000 Com. Inc.*, 117 Cal. App. 4th 212, 220 (2004).....................22

*Smith v. Rae-Venter Law Group*, 29 Cal. 4th 345, 353 (2002)..........................................22

*Steeped, Inc. v. Nuzee, Inc.*, No. 19-CV-03763-HSG, 2020 WL 6891832, at *1 (N.D. Cal. 2020)

............................................................................................................................4

*Vigueras v. Red Robin International, Inc.*, No. 8:17-cv-01422-JVS, 2019 WL 7195333, at *8

(C.D. Cal., 2019).........................................................................................................11

**Statutes**

8 Cal. Code Reg., § 11070 ...........................................................................................5

Cal. Unemp. Ins. Code § 929 ....................................................................................21

California Labor Code § 226(a)(9) .......................................................................23, 24

California Labor Code 2802 ...........................................................................3, 22, 23

California Labor Code section 2802(a).........................................................................4

**Other Authorities**

DLSE Enforcement Policies & Interpretations Manual, § 4.3.4 (June 2002).............................21

DLSE Enforcement Policies & Interpretations Manual, § 45.5.6 (June 2002)...........................20

DLSE Opinion Letter No. 1990.09.18 ........................................................12, 14, 18, 19

DLSE Opinion Letter No. 1994.10.03 ........................................................10, 11, 18, 19

https://en.wikipedia.org/wiki/Khaki .............................................................................6

https://www.merriam-webster.com/dictionary/khaki ........................................................6

U.S. Dept. of Labor, Internal Field Operations Handbook, Section 30c12 ...............................11

Wage Order 5-89 ....................................................................................................11

Wage Order 7 ...................................................................................................12, 17

Wage Order 7-2001...............................................................................................4, 11

**Rules**

Fed. R. Civ. P. 56.....................................................................................................1

Fed. R. Civ. P. 56(c). .................................................................................................4

Fed. R. Civ. P. 56(g) .................................................................................................4

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on August 26, 2021, at 1:30 p.m., in Courtroom 8 of the United States District Court for the Northern District of California, San Jose Division, Defendants Rite Aid Corporation and Thrifty Payless, Inc. (collectively, "Defendants") will and hereby do move this Court for an order granting summary judgment on all causes of action contained in the Second Amended Complaint filed in this matter by plaintiffs Kristal Nucci, Ana Goswick, and Kelly Shaw ("the Named Plaintiffs"), in favor of Defendants and against the Named Plaintiffs (on their behalf and on behalf of the entire class), pursuant to Federal Rule of Civil Procedure 56.

Defendants request that this Court grant this motion on the basis that no triable issue as to any material fact on any cause of action made against the Defendants, and Defendants therefore are entitled to judgment in that (1) Khaki pants are not a "distinctive color or design" and therefore are not a uniform; (2) Khaki pants are a common wardrobe item; (3) Khaki pants are generally usable in the occupation; (4) Navy blue tops consisting of polo shirts, button-down shirts, or sweaters, are not a "distinctive color or design" and therefore are not a uniform; (5) Navy blue tops are common wardrobe items; (6) Navy blue tops are generally usable in the occupation; (7) Plaintiffs' derivative wage claims for failure to pay minimum wage, inaccurate wage statements, and waiting time penalties (third, fourth, and fifth causes of action) fail as a matter of law because expenses are not wages and cannot support a wage claim for failure to pay minimum wage (*Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal.4th 554 (2007)); and (8) Plaintiffs' derivative wage claims for failure to pay minimum wage, inaccurate wage statements, and waiting time penalties (third, fourth, and fifth causes of action) fail as a matter of law because any adjustment of wages based on a finding of a uniform and reimbursement for the same would be an "after-the-fact adjustment," not an "hourly rate in effect during the pay period." *Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 680 (9th Cir. 2021).

Alternatively, if for any reason summary judgment cannot be had, Defendants will and hereby do move for partial summary judgment on the above issues, or any of them, in favor of Defendants.

1    This motion is based upon this notice of motion and motion, the supporting memorandum
2  of points and authorities filed herewith, the evidence and declarations filed herewith, and any
3  further briefing and arguments of counsel as permitted by the Court at the hearing or otherwise.

4  <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

5  **I.    <u>INTRODUCTION</u>**

6    The issue in this case is whether the clothing Plaintiffs were required to wear to work
7  constituted a uniform. The whole point of a "uniform" is found in its etymology: *uni forma*, that
8  is, "having only one form or shape." It is "one form" that distinguishes and identifies a group,
9  and for that reason it is both a noun and an adjective: a uniform *is* uniform. The law recognizes
10  this by requiring three things to constitute a reimbursable uniform: it must be *distinctive color*
11  *design*, *not a common wardrobe item, and not generally usable.* Put another way, a uniform is
12  clothing that, due to its design or color, markedly sets its wearer apart from others, isn't clothing
13  that people typically own, and is clothing that cannot be broadly worn outside its designated
14  context without causing its wearer to stand out. Most people would be startled to wake up and
15  find a Harvard University Band outfit hanging in the closet. But the crimson and white coat with
16  its Harvard University Band logo on front would be immediately recognizable for what it was—
17  a coat signifying membership in the Harvard band. That makes it a *distinctive color and design.*
18  In addition, that outfit would not be found in many closets. It would not be a *not a common*
19  *wardrobe item*. Finally, it would not be usable anywhere other than in the Harvard band, and thus
20  would not be *generally usable* (not even in another band). *That* is a uniform.

21    By contrast, the clothing at issue here—pants in any shade considered "khaki" and polos,
22  button-down shirts, or sweaters in any shade close to navy blue, with no particular design and no
23  Rite Aid logos—met *none* of the criteria for a uniform. Rite Aid associates, including the Named
24  Plaintiffs, could wear, and did wear, a wide range of colors shades of "khaki" and "navy blue,"
25  neither of which is a distinctive color. The clothing was not "one in form," but rather encompassed
26  a wide variety of options, bringing it within what the law considers "very general" and thus
27  outside the scope of a uniform. Moreover, the clothing worn at Rite Aid was commonly found in
28  most people's closets already and could be worn in virtually any other retail setting. No

subsequent retail employer would "look askance" at someone wearing khaki pants or a blue shirt to work. In short, undisputed facts show that the clothing at Rite Aid was not a distinctive color or design, consisted of common wardrobe items, and was generally usable both outside work and within any other retail setting. As such, Plaintiffs' claim for uniform expense reimbursement fails, as do the derivate claims, and summary judgment should be entered in favor of Defendants.

## II.    STATEMENT OF FACTS

### A.    Plaintiffs and Class Members.

In the operative Second Amended Complaint ("SAC"), the Named Plaintiffs claim they were required to wear uniforms requiring reimbursement under California Labor Code 2802. (*See* Declaration of Sweta Patel in Support of Defendants' Motion for Summary Judgment ["Patel Dec."], ¶ 2, Ex. A.) They seek reimbursement for uniform expenses, as well as damages for other derivative claims, for themselves and the members of the class, defined as "All non-exempt employees, excluding pharmacists, pharmacy interns, and asset protection agents, working in any Rite Aid store in California at any time from March 13, 2015 through the trial date."

### B.    Rite Aid's Team Colors Dress Code.

In June 2012, Rite Aid adopted "Policy 4.02(a) – Retail Dress Code" (hereinafter "the Policy") (Declaration of Roger Ceballos ["Ceballos Dec."], ¶ 2, Ex. A.) Under the Policy, Rite Aid required associates to "maintain a professional appearance suitable for the workplace at all times." (*Id.*) The Policy provided "the guidelines for acceptable dress" in the workplace. (*Id.*)

The Policy defined "khaki colored slacks" as "trousers made from woven cloth with a flat front or pleats." (*See id.*) "Button-down shirt" referred to "a navy blue long or short sleeved button-down shirt with a collar that must be tucked in." (*Id.*) "Polo shirt" referred to a "navy blue long or short sleeved shirt with a collar and buttoned opening at the neck that must be tucked in." (*Id.*) "Sweater" refers to a "navy blue knitted or crocheted pullover that extends to the waist or slightly below. (*See id*.)  Finally, the Policy stated: "Khaki colored slacks, skirts, and dresses are the preferred team color." (*See id*.) The Policy permitted associates to wear a company-issued vest in the event an associate was unable to report to work in team colors. (*Id.*)

Rite Aid created a handbook entitled, "Store Dress Standards" (hereinafter "Dress Standards Handbook"). (*See* Ceballos Dec., Ex. B.) The Dress Standards Handbook stated that it "provide[d] the guidelines to be used in conjunction with Rite Aid's Store Dress Policy." The Dress Standards Handbook repeats various portions of the Policy, including the definitions. (*Id.,* at p. 2.) It also includes a section entitled, "Female Standard Attire," which states, "Navy blue polo shirt with collar, button-down shirt with collar, blouse or sweater (long or short sleeved)" and "Khaki colored slacks or skirts which are clean, pressed, and conservative." (*Id.,* at p. 3.) Similarly, the Dress Standards Handbook includes a section entitled, "Male Standard Attire," which states, "Navy blue polo shirt with collar, button-down shirt with collar or sweater (long or short sleeved)" and "Khaki colored slacks which are clean, pressed, and conservative." (*Id.,* at p. 5.) The Dress Standards Handbook advised that shirts could be purchased "from any other retailer of [the associate's] choosing." (*Id.,* at pp. 3, 5.) Finally, the Dress Standards Handbook contained a section listing as "Unacceptable Attire" any "shirt, blouse, or sweater that is not navy blue", as well as "slacks, skirts, or dresses that are not khaki in color. (*Id.*, at p. 9.)

## III.    ARGUMENT

### A.    Legal Standard for Summary Judgment or Partial Summary Judgment.

Summary judgment is proper under FRCP 56(c) where the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Partial summary judgment may be entered when the court finds that there is "no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense." *Steeped, Inc. v. Nuzee, Inc.*, No. 19-CV-03763-HSG, 2020 WL 6891832, at *1 (N.D. Cal. 2020); *see also* Fed. R. Civ. P. 56(g).

### B.    Plaintiffs Must Satisfy All Three Elements of a Three-Part Test to Establish the Existence of Reimbursable Uniform Expenses.

California Labor Code section 2802(a) requires that "[a]n employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer." Section 9 of Wage Order 7-2001 ("Wage Order 7") issued by the California

---

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

Industrial Welfare Commission ("IWC") provides, "[w]hen uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer." (*See* 8 Cal. Code Reg., § 11070.) Wage Order 7 further states, "Under this order 'uniform' includes 'apparel and accessories of distinctive design or color.'" However, clothing is *not* a reimbursable uniform if it constitutes "basic wardrobe items which are usual and generally usable in the occupation." *Becerra v. Radio Shack Corp.*, No. 4:11-CV-03586YGR, 2012 WL 6115627, at *5 (N.D. Cal. Dec. 10, 2012) (citing the IWC's Statement of Basis for the 1980 iteration of Wage Order 7).

Thus, to establish that the clothing at issue constitutes a reimbursable uniform under California law, a plaintiff must prove *all three* of the following elements: (1) The clothing is "*required* to be worn as a condition of employment"[1]; (2) the clothing is of a "distinctive design or color"; and (3) even if the clothing is of a "distinctive design or color," the clothing is *not* a "basic wardrobe item" and is *not* "generally usable" in the industry in question.

Where multiple items of clothing are involved, such as navy blue tops and khaki bottoms here, the court must conduct a separate analysis for each separate article of clothing. *See e.g., Brown v. Abercrombie & Fitch Co.,* No. CV141242JGBVBKX, 2015 WL 9690357 (C.D. Cal. July 16, 2015) (separate analysis performed for clothing and footwear).[2]

### C.   Rite Aid's Requirement of Khaki Pants or Skirts Was Not a Reimbursable Uniform Because Khaki is not a "Distinctive Color."

Plaintiffs are not entitled to reimbursement for khaki pants because khaki is not a distinctive color.

#### 1.   The Plain Meaning of the Word "Khaki" Shows It Is Not a Distinctive Color.

According to the Merriam-Webster online dictionary, "khaki" means a "light yellowish-brown" and derives from a Hindi and Urdu word meaning, "dust-colored." (Request for Judicial

---

[1] Although Rite Aid's position is that *no* employees were *required* to purchase navy blue tops or khaki bottoms as a "condition of employment" because employees had the option to wear a company-provided navy vest, this motion does not address the issue of the vest option.

[2] Rite Aid seeks summary judgment on the uniform issue as to khaki pants and navy blue tops together or partial summary judgment as to either khaki pants or navy blue tops separately.

Notice ("RJN"), Ex. 4, (https://www.merriam-webster.com/dictionary/khaki).) As there is no single, distinctive shade of dust, so too is there no single, distinctive color "khaki." Unlike such distinct colors as "Ruby Red," "Emerald Green," or even "Dodger Blue," each of which evokes a single, unmistakable color in one's mind, the word "khaki" conjures an image of a variety of colors, some of which may not even match. In fact, the word "khaki" sometimes refers not to a color at all, but rather to a style of trousers regardless of color. (https://en.wikipedia.org/wiki/Khaki.) Thus, the plain meaning of the word "khaki" is broad and imprecise; its imprecision compels the conclusion that "khaki" is not one, "distinctive" color, but rather constitutes a genus of color that encompasses numerous species and shades of colors.

> 2. *The Usage and Understanding of "Khaki" within the Fashion and Apparel Industry Shows It Is Not a Distinctive Color.*

The way the word "khaki" is commonly used and understood within the fashion and apparel industry reveals its diversity. As explained in the report of fashion and apparel industry expert Gabriele Goldaper ("Goldaper Report"; *see* Declaration of Gabriele Goldaper ["Goldaper Dec."], Ex. A), the color "khaki" is a light brown with a tinge of yellow and green color that comes in many shades. (*Id.*, at ¶ 22.) A khaki pantone encompasses numerous shades ranging from yellowish white, to greige, to light brown, to greenish brown. (*Id.,* at ¶ 22.) Shades of khaki are a "common wardrobe color and can be seen all year, as opposed to being just a seasonal color." (*Id.,* at ¶ 23.) Because khaki and its many shades can be worn all year around, experts in the fashion/retail business refer to khaki as a "basic" color and *not* as a distinctive color. (*Id.,* at ¶ 23.) Colors not categorized as "basic colors" include trendy colors, current season colors, or novelty colors. (*Id.,* at ¶ 24.)

"Distinctive" colors exist within the fashion and apparel industry. (*Id.,* at ¶ 25.) For example, Tiffany Jewelry Co. Blue, the Louboutin shoe "Chinese Red," the Coach handbag Brown, and even the UPS Brown" all are distinctive colors and brand identifiers." (*Id.*) Each of those colors evokes an association with a specific product, brand, or service. (*Id.*) Because of its multiple shades, as opposed to a very specific shade, and because it is such a basic common color, the color "khaki" is not distinctively associated with any specific product, brand, or service. (*Id.,*

at ¶ 25.)  Within the fashion and apparel industry, therefore, khaki is not a "distinctive" color, but rather it is a very basic, common, and staple color. (*Id.,* at ¶ 30.)

   3.   *Rite Aid's Own Use of the Word "Khaki" Shows It Is Not a "Distinctive" Color.*

Rite Aid's Dress Standards specified merely that associates must wear "khaki colored" slacks or skirts. (Ceballos Dec., Exs. A, B.) "Khaki" was not defined in the Policy or the Dress Standards Handbook. (*Id.*) Nowhere in any document did Rite Aid specify or mandate *any* particular color or shade within the spectrum widely considered to be "khaki." In fact, the sections in the Dress Standards Handbook describing "standard attire" for both men and women contained pictures of four examples of "acceptable" pants, *each of which was a different shade of khaki*:

 

(*See* Ceballos Dec., Ex. B, pp. 4, 6.)

   4.   *Rite Aid Associates Understood Khaki to Include Various Shades and Colors.*

The use and acceptance of a variety of shades and colors within the spectrum of "khaki," as well as Rite Aid associates' divergent understandings of what khaki meant, proves that khaki is not a "distinctive" color. Roger Ceballos, who testified as the PMK in this action, affirms, based on hundreds of visits to California stores and thousands of interactions with associates and managers, that Rite Aid considered a wide variety of shades of khaki to be in compliance with the Policy and Dress Standards. (Ceballos Dec., ¶ 7.) Mr. Ceballos notes that "khaki" means different things to different people and contains a great deal of variation. (*Id.*) There are many colors within "khaki," and Ceballos personally saw khaki pants worn by Rite Aid associates that ranged from off-white, brownish, bronze, and olive to gray, all of which were acceptable under the Dress Standards and the Policy. (*Id.*) Mr. Ceballos personally has worn many different colors

---

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
7

of khaki-style pants when making store visits. As long as the clothing was something "close" to khaki, it was acceptable. (*Id.*)

The Named Plaintiffs themselves expressed disagreement about what "khaki" means. Plaintiff Ana Goswick ("Goswick") testified that "khaki is like beige color kind of" but also testified that she noticed other coworkers wearing "a little bit darker" shade. (Goswick Depo., at 80:23-81:6 [Patel Dec., Ex. G].) Plaintiff Kelly Shaw ("Shaw") described khaki as "that tan color." (Shaw Depo., at 26:24 [Patel Dec., Ex. H].) Plaintiff Kristal Nucci ("Nucci") admitted that people can have different ideas about what the color khaki means. (Nucci Depo., 75:9-21 [Patel Dec., Ex. B].) She personally described khaki as "tan or beige." (*Id.*, at 71:16.) Nucci testified that khaki cannot be a "yellowish brown" or a "dark yellowish green", but can be a "light tan" and possibly a "sandalwood"; she testified that khaki cannot be the color of soil or the color of light coffee with cream (*Id.*, at 73:18-75:3). When shown colors in her first session of deposition, Nucci said these three colors would be acceptable at Rite Aid:



(*Id.*, at 44:18-45:5, Exs. 11, 12 and 13.)

In the second session of her deposition, Nucci viewed the following exhibit containing 35 shades of khaki:

| 8200W Bleached Sand | 8210W Whispering Birch | 8220W Hayseed | 8230W Sunbaked Sand | 8240W Windrift |
|---|---|---|---|---|
| 8201W Burma Buff | 8211W Sandy Lane | 8221W Botany Beige | 8231W Sawyer's Fence | 8241W Tenderfoot |
| 8202W Coast Pointe | 8212W Millet | 8222W Desert Fawn | 8232W Lulled Beige | 8242W Northern Plains |
| 8203M Gobi Beige | 8213M Plantation Beige | 8223M Sienna Sand | 8233M Crisp Khaki | 8243M Amber Waves |
| 8204M Spice Bounty | 8214M Tobacco Road | 8224M Balsam Bark | 8234M Daplin | 8244D Copper Springs |
| 8205D Brass Bucket | 8215D Tattersall Brown | 8225D Autumn Wheat | 8235D Brush Box | 8245A Ochre Rust |
| 8206N Tarrytown | 8216N Dried Tobacco | 8226N October Oak | 8236N Gumnut | 8246N Queensland Walnu |

After viewing the colors above, Nucci identified only three shades ("Spice Bounty", "Tobacco Road", and "Plantation Beige") as "khaki" even though many other shades were "light tan" and although other shades overlapped with the shades she identified in the first session of her deposition as acceptable shades of khaki at Rite Aid. (*Id.*, at 80:5-85:4 Ex. 29.)

The Named Plaintiffs were shown the following colors in their depositions:



**1**                                                                 **2**

Nucci testified that No. 1, above, complied with the dress code (*Id.*, 44:18-45:5), but Shaw said it was "a little yellow" (Shaw Depo., 64:7-13 [Patel Dec., Ex. H]) and Goswick said "maybe" people wore that color at Rite Aid. (Goswick Depo., 135:9-15 [Patel Dec., Ex. G].) Meanwhile, Nucci testified that No. 2, above, *would* comply with the dress code but Goswick said neither she nor her co-workers wore that color *(id.* at 135:20-136:1) whereas Shaw testified that it would not comply with Rite Aid's dress code. (Shaw Dep., 65:4-5 [Patel Dec., Ex. H].)

Other non-named-plaintiff class members reviewed the following colors and were asked which color(s) were appropriate to wear to work at Rite Aid:

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|
|   |   |   |   |   |   |   |   |

Two class members working in the same store on the same day had differing interpretations. Whereas Mr. Shaw (unrelated to the named plaintiff Shaw) believed that #8, above, was "khaki", Mr. Daniels thought that that same color was not khaki and inappropriate to wear to work. (*See* Daniels Dec., ¶ 6 and Shaw Dec., ¶ 6 [Patel Dec., Ex. C, Exs. 28, 62].) Similarly, Ms. Thomas believed that #2 and #6 were not appropriate to wear to work, whereas Ms. Jung believed the same colors were acceptable. (*Cf.* Jung Dec. ¶ 7 with Thomas Dec. ¶ 5 [Patel Dec., Ex. C, Exs. 39, 67].) Several class members and store managers believed *all eight* colors constituted "khaki" in compliance with Rite Aid's store dress standards. (*See, e.g.*, Culp Dec. ¶ 7, Edwinson Dec. ¶ 6; [Patel Dec., Ex. C, Exs. 27, 33].) Other class members described

khaki as being an even wider array of colors, including black,[3] "dark-colored,"[4] off-white,[5] brown[6], cream,[7] green,[8] gray,[9] and tan.[10]

There is a simple reason why the testimony regarding the color "khaki" is so divergent and varied: *"khaki" is not distinctive*. The testimony of Shaw, Nucci, Goswick, Ceballos, and others, and the inconsistencies in that testimony, proves that "khaki" is not one particular, markedly distinct color; rather, "khaki" is open to subjective interpretation because it encompasses such a wide variety of colors and shades.

"Distinctive" can reasonably be read to mean either "specific" or "unique or uncommon" and is therefore ambiguous standing on its own. *Becerra*, 2012 WL 6115627, at *3. When the meaning of an enactment is not plain from the words itself, a court may look to an agency's interpretations of its meaning. *Id.,* citing *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal.4th 1094, 1103, 56 Cal.Rptr.3d 880, 155 P.3d 284 (2007). The DLSE has opined that requiring employees to wear polo shirts of an unspecified manufacturer in *one of five* general colors would not be distinctive enough to constitute a uniform. (RJN, Ex. 2, DLSE Opinion Letter No. 1994.10.03.) The DLSE reasoned that the "very general nature" of the company's requirement "takes it out of the category of a 'distinctive design' or 'distinctive color.'" (*Id.*)

Rite Aid required no specific manufacturer and no specific color. The Policy and Dress Standards said only, "khaki," without qualification. As seen above, "khaki" encompasses at least 35 different shades and colors, and Rite Aid permitted "anything close." Thus, the number of color choices available to Rite Aid associates was at least *seven times greater* than the five colors available in DLSE Opinion Letter No. 1994.10.03. The DLSE's own opinion compels the

---

[3] *See* Declarations of Attanasio ¶ 10, Carr ¶ 7, Edwinson ¶ 5, Salcedo ¶ 5, Thomas ¶ 3 [Patel Dec., Ex. C, Exs. 19, 25, 33, 59, 67].

[4] *See* Macintosh Dec., ¶ 5 [Patel Dec., Ex. C, Ex. 74].

[5] *See* Declarations of Burzenski ¶ 6, Lovett ¶ 9 [Patel Dec., Ex. C, Exs. 24, 45].

[6] *See* Declarations of Beason ¶ 3, Edwinson ¶ 6, Lovett ¶ 9, Meza ¶ 3, Peru ¶ 5, Rekhopf ¶ 10, Sevilla ¶ 6, Sullivan ¶ 7 [Patel Dec., Ex. C, Exs. 21, 33, 45, 52, 55, 58, 61, 66].

[7] *See* Declarations of Beason ¶ 3, Jung ¶ 7, Meza ¶ 3 [Patel Dec., Ex. C, Exs. 21, 39, 52].

[8] *See* Declarations of Burzenski ¶ 6, Jung ¶ 7, Sevilla ¶ 10 [Patel Dec., Ex. C, Exs. 24, 39, 61].

[9] *See* Declarations of Carr ¶ 7, Jung ¶ 7, Sevilla ¶ 6, Siatanuu ¶ 12. [Patel Dec., Ex. C, Exs. 25, 39, 61, 63.]

[10] *See* Declarations of Edwinson ¶ 6, Peru ¶ 5, Sullivan ¶ 7 [Patel Dec., Ex. C, Exs. 33, 55, 66].

conclusion that the "very general nature" of "khaki" provides sufficient choices to "take it out of the category of a distinctive design or color."

### D.     Khaki-Colored Pants Are a Common Wardrobe Item.

In its Statement of Basis for Wage Order 5-89, the predecessor to Wage Order 7-2001, the IWC explained that "basic wardrobe items" of "unspecified design" are not considered a "uniform":

> The definition [of "uniform"] and [DLSE] enforcement policy is sufficiently flexible to allow the employer to **specify basic wardrobe items which are usual and generally usable in the occupation, such as white shirts, dark pants and black shoes and belts, all of unspecified design, without requiring the employer to furnish such items.**

As discussed above, the DLSE has opined that requiring employees to wear polo shirts of unspecified manufacturer in any one of five general colors did not amount to a "uniform" because the "very general nature of the requirement which [the employer sought] to impose [took] it out of the category of a 'distinctive design' or 'distinctive color.'" (RJN, Ex. 2, DLSE Opinion Letter No. 1994.10.03.) Similarly, the United States Department of Labor does not consider basic clothing items to constitute a uniform: "If an employer merely prescribes a general type of ordinary basic street clothing to be worn while working and permits variations in details of dress the garments chosen would not be considered to be uniforms." (RJN, Ex. 5, U.S. Dept. of Labor, Internal Field Operations Handbook, Section 30c12.)

Clothing of a "very general nature" such as nondescript black shoes and shirts are "basic wardrobe items" that do not constitute a uniform. *Perez v. DNC Parks & Resorts at Sequoia*, No. 119CV00484DADSAB, 2020 WL 4344911, at *10 (E.D. Cal. July 29, 2020). Generic, monochromatic clothing that are common in the occupation are not considered uniforms within the meaning of the statute. *Vigueras v. Red Robin International, Inc.*, No. 8:17-cv-01422-JVS, 2019 WL 7195333, at *8 (C.D. Cal., 2019). As such, V*igueras*, held that employee purchases of "generic, monochromatic, black collared shirts and dark blue denim jeans or shorts that could be worn in the context of other restaurant jobs, among many other contexts" were not uniforms. *Id.*

Khaki pants are common wardrobe items, whether worn separately or in combination with

navy blue tops. (Goldaper Dec., Ex. A, ¶¶ 23, 28, 29a., 29b.) The color khaki and its many shades is commonly used at the retail level by many brands, and each brand may use a different shade of the khaki color. (Goldaper Dec., Ex. A, ¶ 26, Ex. 2.) That khaki pants are a common wardrobe item is apparent from the fact that khaki has widespread availability as it sold in a wide variety of shades and styles by major retailers such as JC Penney, Target, Kohl's, Walmart, Amazon. (*Id.*) Khaki pants of an unspecified brand and shade are thus a basic wardrobe item, and are not a reimbursable uniform.

**E.      Khaki-Colored Pants Are "Generally Usable" within the Occupation.**

An employer may specify basic wardrobe items which are "generally usable in the occupation." (1989 Statement of Basis for Wage Order 7.) Even if a particular color is specified, the employer is not required to reimburse the employees for the clothing if it is "generally usable in the occupation." (*Id.*)

In 1990, the DLSE evaluated whether tropical attire (i.e., floral "Hawaiian" shirts) and rugby pants would be exempt from reimbursement because they were "generally usable" in the restaurant industry. In defending the uniform, the employer argued that floral shirts were popular in California fashion. According to the DLSE, the salient question is not whether clothing is popular, but "whether the employee could be expected to be able to use the outfit while working at his or her 'occupation' with another employer." (RJN, Ex.3, DLSE Opinion Letter No. 1990.09.18.) The DLSE concluded that "most restaurants would look askance at waiters and waitresses who came to work in 'tropical attire' which included floral shirts and rugby pants." (*Id.*) As such, the DLSE opined that Hawaiian shirts and rugby pants would be a reimbursable uniform. (*Id.*)

The same cannot be said of khaki pants in the retail industry. The duties of the class members place them within occupational classifications for Retail Salespersons and Cashiers. (*See* Expert Report of Roderick Stoneburner, p. 2 [Patel Dec., Ex. E].) Their skills render them employable in similar capacities beyond drug stores. Rite Aid employees with a documented successful employment history can consider employment within the broad spectrum of businesses that use retail clerks. (*Id.*) Plus, pharmacy technicians can naturally work at any other pharmacy,

1   which includes chain pharmacies and independent pharmacies.

2   There is no question that khaki pants are "generally usable" within the occupation of retail

3   clerks or pharmacy technicians. The color khaki, and its many shades, is commonly used at the

4   retail level by many brands. (Goldaper Dec., Ex. A, ¶ 26, Ex. 2.) Khaki is a common and staple

5   wardrobe color. (*Id.,* at ¶ 27.) Khaki blends easily with whatever the consumer already has in their

6   wardrobe and the color blends easily with whatever the manufacturer is promoting in its product

7   line. (*Id.*) Khaki is compatible with most other colors, and does not stand out and is not associated

8   with any particular brand. (*Id.*) Although popular with consumers, khaki's compatibility and

9   universality does not mean khaki it is distinctive or is used as an identifier. (*Id.*) To the contrary,

10   various brands use khaki in their color story, and as such khaki, as a common wardrobe color, is

11   worn by people who are not employed by Rite Aid. (*Id.,* at ¶ 28.) Employees of Rite Aid can be

12   very comfortable wearing the khaki color outside their place of employment. (*Id.*) Khaki pants

13   are generally usable in the retail and customer service industry, and employees will blend in well

14   within the customer service-retail industry at large, as well as any social setting. (*Id.* at ¶ 28, Ex.

15   3). Khaki colored pants are common wardrobe items and can be worn by employees outside of

16   their place of employment. (*Id.,* at ¶ 29a.)

17   The Named Plaintiffs acknowledge the general usability of khaki. Shaw testified that she

18   would have been able to wear the khaki and shirts she wore at Rite Aid to her other part-time job

19   at Whole Foods. (Shaw Depo., at 19:3-6 [Patel Dec., Ex. H].) Nucci testified she could wear khaki

20   pants to the mall, a restaurant, a movie theatre, or a library; in fact, she could not think of any

21   place she could not wear khaki (and navy blue). (Nucci, Depo., at 105:10-106:24 [Patel Dec., Ex.

22   B].) Other class members similarly acknowledged that they could have worn the khakis that they

23   wore at Rite Aid at their prior places of employment as well, including at Walgreens, Whole

24   Foods and Michael's. (*See* Shaw Depo., at 19:3-6 [Patel Dec., Ex. H]; Attanasio Decl. ¶3,

25   Burzenski Decl. ¶3 [Patel Dec., Ex. C, Exs. 19, 24].)

26   This is not to say that, at any given moment, one might *observe* a large number of other

27   retail clerks or pharmacy technicians wearing khaki (or navy blue). As the DLSE has explained,

28   the question is not whether the clothing is e*n vogue,* such that it might be ubiquitously observed;

DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR,
ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
13

1   rather, the DLSE test is whether Rite Aid associates could be expected to be able to use their same

2   clothing while working in their occupation with another employer. (RJN, Ex. 3, DLSE Opinion

3   Letter No. 1990.09.18.) It is indisputable that Rite Aid employees could walk out of a Rite Aid

4   and start working in virtually *any* other retailer wearing khaki pants, and (unlike a waiter wearing

5   a floral shirt and rugby shorts) no subsequent employer would "look askance" at them for wearing

6   khaki pants. Rite Aid associates could leave Rite Aid and "blend in well within the customer

7   service-retail industry at large." (Goldaper Dec., Ex. A at ¶ 28.) Given the variety of shades,

8   colors, and styles that were acceptable under Rite Aid's team colors approach, it is clear that Rite

9   Aid associates could have expected to be able to wear their clothing at work with other pharmacies

10  and other retailers. Therefore, khaki pants are not a uniform because they are "generally usable".[11]

### F.   Navy Blue Tops Are Not a Uniform Because They Are Not Distinctive.

12  Navy blue is a very dark shade of the color blue. (Goldaper Dec., Ex. A, ¶ 31.) There are

13  numerous separate shades of blue within the navy blue pantone:



16  (Goldaper Dec., Ex. A, ¶ 31, Ex 4.)

17  Shades of navy blue can be seen all year in the fashion and apparel industry. (Goldaper

18  Dec., Ex. A at ¶ 33].) As such, it is referred to in the fashion/retail business a "basic" color, as

19  opposed to a seasonal color, and not a distinctive color. (*Id*.) It is a "functional color" because it

20  can be used in so many ways. (*Id.,* at ¶ 34.) Navy blue is distinctive and is not used as an identifier.

21  (*Id.,* at ¶¶ 36, 40.)

22  As with khaki, Rite Aid in practice permitted a variety of shades within the genus of "navy

23  blue." (Ceballos Dec., ¶ 7.) Navy blue means different things to different people and contains a

24  great deal of variation. (*Id.*) Associates at Rite Aid wore tops in various shades of navy blue, from

---

26  [11] Plaintiffs are expected to argue that "generally usable" only applies to such job-specific clothing
27  as nursing scrubs or black pants and white shirts for waiters. However, *no DLSE opinion letter
    says that.* Rather, the test is "whether the employee could be expected to be able to use the outfit
28  while working at his or her 'occupation' with another employer." (RJN, Ex. 3, DLSE Opinion
    Letter No. 1990.09.18.)

something as dark as an almost black color, to a deep sky blue, to a more purple-blue. (*Id*.) Rite Aid permitted a wide variety of shades within the genus of "navy blue." (*Id*.) As with khaki, navy blue has always been ranges of colors because one can't dictate what navy is to somebody, since they may see it differently. (*Id*.) As long as the clothing was something close to the theme of khaki and navy blue, it was acceptable. (*Id*.)

Class members have confirmed this. Store Leader Willie Alexander declared: "At work, I see the hourly associates wearing varying shades of blue and it is not a problem for me. Some shirts are lighter blue, others look so dark that they look purple to me. These shades are acceptable to wear to work." (Alexander Dec. ¶¶ 23-25 [Patel Dec., Ex. C, Ex. 17].) Similarly, Emil Buenafe declared: "I also see my coworkers wearing various shades of dark blue to work" (Buenefe Dec., ¶ 19 [Patel Dec., Ex. C, Ex. 23].) and Rochelle Edwinson declared: "My interpretation of an appropriate team color for tops is a broad range of most shades of blue and black." (Edwinson Dec., ¶¶ 21-22 [Patel Dec., Ex. C, Ex. 33].)

As with khaki, both the Named Plaintiffs and other class members identified a variety of shades as "navy blue." Nucci testified that the blue tops she wore to work were all different shades of blue, and she had coworkers who did not wear navy blue to work. (Nucci Depo., 26:7-10; 31:19-32:7 [Patel Dec., Ex. B].) She also confirmed that any number of colors would have fit within Rite Aid's dress standards, from purple to gray to dark blue for tops (and cream to brown to gray for pants). (*Id.,* at 37:13-44:25.) Nucci testified there "might be two or three different shades of navy blue," which she described as "deep navy blue," "a medium shade of navy blue," and "a little bit of a lighter shade." (*Id.*, 86:9-22.) In the following spectrum, Nucci identified only the last three shades on the right as "navy blue":



(*Id.*, 89:12-20.)

But the Named Plaintiffs expressed varying opinions about what constituted an acceptable shade of navy blue at Rite Aid. For example, the Named Plaintiffs were shown the following four shades of navy blue (among others):

1
2
3
4



**1**          **2**          **3**          **4**

5   Appearing to contradict her other testimony that only the three shades to the right in the

6   pantone constituted acceptable navy blue, Nucci testified that No. 1, above, *was* acceptable (Nucci

7   Depo., 39:24-40:3 [Patel Dec., Ex. B]), while Goswick said neither she nor her coworkers wore

8   that color to work (Goswick Depo., 130:15-20 [Patel Dec., Ex. G]) and Shaw said it was *not* an

9   acceptable shade of blue at all. (Shaw Depo., 57:5-11 [Patel Dec., Ex. H].) Meanwhile, Nucci

10  thought No. 2, above, "maybe" was acceptable (Nucci Depo. 40:19-21 [Patel Dec., Ex. B]),

11  Goswick said neither she nor her coworkers wore that color (Goswick Depo., 130:25-131:4 [Patel

12  Dec., Ex. G), and Shaw said it was not acceptable (Shaw Depo. 59:2-4 [Patel Dec., Ex. H].) Nucci

13  thought No. 3 was *not* acceptable (Nucci Depo., 47:23-48:2 [Patel Dec., Ex. B]), whereas

14  Goswick said it was what she wore to work at Rite Aid (Goswick Depo., 131:11-14 [Patel Dec.,

15  Ex. G]) and Shaw thought it was a "little lighter than navy blue" but "could possibly pass" (Shaw

16  Depo., 59:16-25 [Patel Dec., Ex. H].) Finally, all three Named Plaintiffs testified that No. 4—a

17  color that appears to be *black*—was acceptable or was what they wore at Rite Aid. (Nucci Depo.

18  48:13-19 [Patel Dec., Ex. B], Goswick Depo., 131:24-25 [Patel Dec., Ex. G], Shaw Depo., 60:11-

19  17 [Patel Dec., Ex. H].) In short, their opinions were all over the place.

20  Other class members identified still *other* shades of navy blue as the acceptable color for

21  shirts at Rite Aid. Class members were shown the below set of seven colors and asked which

22  color(s) tops were appropriate to wear to work.

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|


26  Numerous class members and store managers said *all* these colors comported with "navy

27  blue" in Rite Aid's dress standards. (Declarations of Bachnick ¶ 5, Borck ¶ 3, Delgadillo ¶ 8,

28  Edwinson ¶ 5, Greene ¶ 9, Jung ¶ 6, Kumar ¶ 10, Leyden ¶ 7, Luna ¶ 6, Martinez ¶ 10, Meza ¶ 2,

Muro ¶ 9, Rai ¶ 13, Siatunuu ¶9, Solis ¶ 6 [Patel Dec., Ex. C, Exs. 20, 22, 30, 33, 36, 39, 41, 43, 46, 50, 52, 53, 56, 63, 64].) Class members opined that royal blue is part of the navy blue spectrum of colors worn by class members, as were a "broad range of most shades of blue and black." (Declarations of Edwinson ¶¶ 3, 5, Flores ¶ 3, Jung ¶ 6, Luna ¶ 4 [Patel Dec., Ex. C, Exs. 33, 34, 39, 46].)

The wide variety of subjective interpretations of "navy blue," the various and divergent shades and colors identified by the Named Plaintiffs and other class members as acceptable at Rite Aid, and Rite Aid's practice of permitting a variety of shades of "navy blue" all compel the conclusion that "navy blue"—at least the navy blue in Rite Aid's dress guidelines—was not a "distinctive color." Rather, like khaki, navy blue encompasses various shades and colors.

### G.     Navy Blue Tops Are Common Wardrobe Items.

Rite Aid's requirement that its associates wear an unspecified brand and shade of navy blue tops (polos, sweaters, or button-down shirts)[12] was not a uniform because navy blue tops are a common wardrobe item. The color navy blue, and its many shades, is commonly used at the retail level by many brands. (Goldaper Dec., Ex. A, ¶ 35, Ex. 5.) Each brand may use a different shade of the navy blue color. (*Id.*) Navy blue is a common and staple wardrobe color and is commonly used by manufacturers when creating their product line. (Goldaper Dec., Ex. A, ¶ 36.) Navy blue is a year-round color that blends easily with whatever the consumer already has in their wardrobe and with whatever the manufacturer is promoting in a variety of product offerings (Goldaper Dec., Ex. A ¶ 36, Ex. 3.) It is compatible with most other colors, does not stand out, and it is not associated with any particular brand. (*Id.,* at ¶ 36.) Thus, consumers generally like navy blue and its many shades. (*Id.,* at ¶ 36.) The compatibility and universality of navy blue does not make it distinctive, nor is it used as an identifier. (*Id.,* at ¶ 36.)

Because navy blue tops (including polos, sweaters, and button-down shirts) are basic and common wardrobe items of an unspecified design, they are not reimbursable as a uniform. (Wage Order 7.) As discussed above, an employer was not required to supply or pay for polo shirts when

---

[12] Many class members also wore t-shirts even though that category of tops is not specifically identified in the policy. (Declarations of Culp ¶ 5, Greene ¶ 7, Jung ¶ 3, Rai ¶ 11, Solis ¶ 3, Sullivan ¶ 6 [Patel Dec, Ex. C, Exs. 27, 36, 39, 56, 64, 66].)

1  employees were permitted to wear up to *five* different colors because offering *five* options of tops

2  rendered the dress guideline "very general" and therefore beyond the definition of a uniform.

3  (RJN, Ex. 2, DLSE Opinion Letter No. 1994.10.03.) Notably, requiring an unspecified brand of

4  polo shirt—a common wardrobe item—did not constitute a distinctive design itself. Had the

5  DLSE believed that a polo shirt was a distinctive design or not a common wardrobe item, it would

6  have stated as much in that opinion letter. Instead, the DLSE concluded the opposite: requiring

7  polo shirts in one of five colors is general enough to be outside the definition of a uniform.

8       Here, the evidence shows that Rite Aid permitted *any* shade of navy blue *and* permitted

9  polos, button-down shirts, or sweaters. There are at least ten shades within the navy blue pantone.

10  (Goldaper Dec., Ex. A, Ex. 4.) Multiplying the number of shades by the three options for tops

11  (polos, sweaters, and button-downs), Rite Aid gave its employees at least 30 shirt options (or

12  using just the *five* darker shades, at least 15 options)—far greater than the number of colors

13  offered by the employer in the DLSE Opinion Letter 1994.10.03.[13] If it was not a uniform to

14  require one of five colors of polo shorts because of the "very general nature" of the clothing, it

15  cannot be a uniform to permit employees to wear polos, button-down shirts, or sweaters of any

16  shade of navy blue or color that was "close."

17      **H.**    **Navy Blue Tops Are "Generally Usable" within the Occupation.**

18       Navy blue tops (including polos, button down shirts, and sweaters) are not a reimbursable

19  uniform because they are generally usable in the retail and customer service industry, including

20  pharmacies. As discussed above, the relevant inquiry is "whether the employee could be expected

21  to be able to use the outfit while working at his or her 'occupation' with another employer." (RJN,

22  Ex. 2, DLSE Opinion Letter No. 1990.09.18.)

23       Rite Aid associates can be very comfortable wearing the navy blue color outside of their

24  place of employment. (Goldaper Dec., Ex. A at ¶ 38.) Inasmuch as many brands use navy blue in

25  their color story, navy blue is a common wardrobe color worn by people who are not employed

---

26

27  [13] DLSE Opinion Letter No. 1994.10.03 contains *no* discussion of shades of colors, nor was that

28  a basis for the opinion. Thus, the stated premise adopted by the DLSE was that polo shirts with *five* color options would be clothing of a "very general nature" and would not constitute a uniform. (RJN, Ex. 2, DLSE Opinion Letter No. 1994.10.03.)

by Rite Aid. (Goldaper Dec., Ex. A at ¶ 37, Ex. 3.) Rite Aid associates will "blend in well with other folks in malls, in retail stores, pharmacies as well as at family or social gatherings. (*Id.* at ¶ 38, Ex. 3.) The color navy blue and the color khaki, separately or together, may be worn within the retail and customer service industry at large, and doing so would not cause a person wearing them to stand out or seem out of place. (Goldaper Dec., Ex. A at ¶ 50.)

Some associates have confirmed that they wore navy blue and khaki at other employers before joining Rite Aid. (*Id.* at ¶ 38 (citing Carr Dec., ¶¶ 17-19, Lanes Dec., ¶¶ 23-24, [*See* Patel Dec., Ex. C, Exs. 25, 44].) A review of video of employees in other retail stores[14] and pharmacies surrounding the Rite Aid stores where the Named Plaintiffs worked reveals that a wide variety of clothing is acceptable within the retail and customer service industry, and neither khaki nor navy blue, nor the combination of both together, would be out of the ordinary. (*Id.*) A person wearing khaki or navy blue, or the combination of both, in a retail setting outside a Rite Aid store would not be readily identifiable as an employee or Rite Aid, nor would the person stand out as someone in uniform. (*Id.*)

There is zero evidence that any employer would "look askance" at someone who migrated from Rite Aid to another retailer or pharmacy and showed up to work in a navy blue top. (DLSE Opinion Letter No. 1994.10.03.) To the contrary, all evidence confirms that an employee wearing a navy blue top from Rite Aid "could be expected to be able to use" the same shirt "while working at his or her 'occupation' with another employer." (RJN, Ex. 2, DLSE Opinion Letter No. 1990.09.18.) As such, Rite Aid's navy blue top option is not a reimbursable uniform under Wage Order 7.

## I.     The "Blockbuster Case" Is Completely Inapposite.

Defendants expect Plaintiffs to rely on *Department of Industrial Relations ("DIR"), Division of Labor Standards Enforcement ("DLSE") v. U.I. Video*, 55 Cal. App. 4th 1084 (1997) ("the Blockbuster case") for the proposition that navy blue and khakis are a uniform. After all, the 2002 Update to the DLSE Enforcement Manual itself cites that case, stating:

---

[14] There is a hyperlink to the videos in Ms. Goldaper's report. (Goldaper Dec., Ex. A, ¶ 50.) If the Court would prefer hard copy videos, Defendants will make them available.

45.5.6 Clothing And Accessories Of A Distinctive Design. DLSE has taken the position that clothes of a particular design (e.g., tropical shirts) would be so distinctive as to require that the employer pay the cost of such clothes. (O.L. 1990.09.18) In the case of *DIR v. UI Video* (1997) 55 Cal.App.4th 1084, the dress code imposed by the employer which was found to be a uniform consisted of a blue shirt and tan or khaki pants.

(RJN, Ex. 1.)

However, the DLSE's suggestion that the Blockbuster case "found" khaki and navy blue to be a uniform is false and highly misleading. In the Blockbuster case, the DLSE took the position that *Blockbuster's* combination of khaki pants *with specifically designed Blockbuster polo shirts*[15] constituted a uniform. Blockbuster agreed to settle the case, and a dispute arose concerning the performance of the settlement. The court *never decided* the issue of whether Blockbuster's clothing (including, presumably, its custom Blockbuster-labeled shirts) constituted a uniform. The *only* issue was whether Blockbuster breached the payment terms of settlement agreement. *See DIR v. UI Video, supra,* 55 Cal. App. 4th at 1090-97.

As Plaintiffs' own DLSE expert concedes, the DLSE has *never* opined that navy blue and khaki constitutes a uniform, and neither the Blockbuster case, *nor any other case*, has ever adjudicated the issue. (*See* Deposition of Daniel Cornet, 73:17-74:3, 106:14-108:24 [Patel Dec., Ex. D].) In fact, the opinion in the Blockbuster case does not even contain the words "blue," "shirt," or "tan." It is therefore blatantly false for the Manual to state that that the case "found" *any* clothes to be a uniform, let alone to suggest that some *generic* combination of navy blue and khaki or tan was "found to be a uniform." The Manual should be given no deference. *Morillion v. Royal Packing Co.*, 22 Cal. 4th 575, 582 (2000), as modified (May 10, 2000) (DLSE interpretation of "hours worked" in 1989 Operations and Procedures Manual should be given no deference). Any reliance on *DIR v. UI Video* for the proposition that khaki and navy blue necessarily a uniform is wholly misplaced and should be rejected.

**J.      Plaintiffs' Derivative Claims Fail as a Matter of Law and Should be Dismissed.**

---

[15] Unlike Rite Aid's dress standards for tops, Blockbuster's shirts over the years all had a Blockbuster logo, some had yellow sleeve trim and collars, and everyone wore the same shade of navy blue in each era of its use. Some examples of Blockbuster shirts found on the internet are attached as Exhibit F to the Declaration of Sweta Patel.

Derivative claims should be dismissed if the Court finds that the underlying claims should be dismissed. *Garcia v. Wal-Mart Stores, Inc.*, No. CV-1601645-BRORAO, 2017 WL 10402969, at *6 (C.D. Cal. Apr. 6, 2017). In this action, Plaintiffs allege multiple theories of liability, all of which stem from the claim that Defendants failed to reimburse or provide "uniforms." (SAC ¶¶ 22-29.) Plaintiffs' allegations in their Second Amended Complaint are binding. *J & J Sports Prods., Inc. v. Flores*, No. 1:10-CV-02087-AWI, 2013 WL 3456970, at *4 (E.D. Cal. July 9, 2013) [summary judgment properly awarded to defendant on theories of liability not previously asserted by plaintiffs.] The team colors, as a matter of law, were not a "uniform." Thus, the Defendants did not require the Plaintiffs to purchase a "uniform." As Plaintiffs derivative theories of liability are dependent upon their theory that they were required to purchase a "uniform" these theories of liability fail and should be dismissed on summary judgment.

**K.     Failure to Reimburse for a Business Expense Cannot Result in Minimum Wage Violation.**

Even if Plaintiffs' uniform reimbursement claim survives this motion, Plaintiffs' derivative third, fourth, and fifth causes of action for failure to pay minimum wage, wage statement violation for failing to state accurate pay rate and waiting time penalties fail as a matter of law because failure to reimburse for business expenses, which is a nonwage claim, cannot trigger a wage claim for failure to pay minimum wage. (*See* SAC ¶¶ 24-27, 52-71.)

California Labor Code section 200 defines "wages" as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Reimbursements for business expenses or "uniforms" are not "for labor performed" and therefore are not "wages." Consistent with the statutory language, the DLSE does not consider business expenses to constitute wages. Cal. Unemp. Ins. Code § 929 ("Wages' does not include the actual amount of any required or necessary business expense incurred by an individual in connection with his employment ..."); RJN Ex. 1, DLSE Enforcement Policies & Interpretations Manual, § 4.3.4 (June 2002) ("'Any wages' includes any amount due as wages ... but does not include expenses."); *see*

also *Nelson v. Dollar Tree Stores, Inc.*, No. 2:11-CV-01334 JAM, 2011 WL 3568498, at *3 (E.D. Cal. Aug. 15, 2011).

In 2002 the California Supreme Court "characterized claims seeking reimbursement of business expenses as 'nonwage' claims." *S. California Pizza Co., LLC v. Certain Underwriters at Lloyd's, London etc.*, 40 Cal. App. 5th 140, 151 (2019), citing *Smith v. Rae-Venter Law Group*, 29 Cal. 4th 345, 353 (2002) superseded by statute on other grounds as stated in *Sampson v. Parking Service 2000 Com. Inc.*, 117 Cal. App. 4th 212, 220 (2004); *see also Nelson*, 2011 WL 3568498, at *5. Five years later, the California Supreme Court, in *Gattuso*, 42 Cal. 4th 554, once again held that expense reimbursements are not wages:

> "Section 200 [of the Labor Code] highlights a valid and important distinction between wages (as payment for labor performed) and business expense reimbursement. The amount payable as wages is subject to various statutory restrictions, including minimum wage laws, which operate independently of, and in addition to, section 2802's obligation of an employer to fully reimburse an employee's necessary business expenses . . . **wages and expense reimbursement are conceptually distinct** and subject to different statutory and sometimes also contractual constraints ... "

*Id*. at 572. (emphasis added.)

Not only does *Gattuso* supersede cases that may have arguably held otherwise, but it also holds that "decisions concerning section 2802's application to public entity employers" are "unhelpful" in private employer cases such as this one because section 2802 does not apply to public employers. *Id.* at 562. Therefore, reliance on cases involving a public entity is inapposite because these cases do not include a finding that failure to reimburse for business expenses could result in employees being paid below minimum wage, thus triggering waiting time penalties. *See In re Work Unif. Cases*, 133 Cal. App. 4th 328 (2005) (section 2802 does not require public entities to pay claims for costs related to employee work uniforms, as uniform costs were part of compensation that were prescribed and bargained for by the public entity).

The California Supreme Court has held that, unlike expenses reimbursements, wages are subject to statutory requirements, such as minimum wage laws. *Gattuso*, 42 Cal. 4th at 572. Therefore, an employer's failure to reimburse cannot be the basis for a minimum wage claim and other derivative wage and hour violations such as Plaintiffs' third, fourth and fifth causes of action

allege. Nor is it availing to argue that *Gattuso* is not applicable because *Gattuso* involved mileage rather than uniforms. Any such distinction is immaterial because Labor Code Section 2802 governs both types of expenses and rather than limiting its holding to mileage reimbursements, *Gattuso* held that "***wages and expense reimbursement are conceptually distinct.***" *Gattuso*, *supra,* 42 Cal. 4th at 572.[16]

### L. Plaintiffs' Derivative Wage Statement Claims Fail Because Rite Aid's Wage Statements Were Accurate, and There Was No "Hourly Rate in Effect" Based on Reimbursement for Uniform Expenses.

Plaintiffs' fourth cause of action alleges violations of Labor Code section 226(a) based on the alleged failure to furnish accurate wage statements. (*See* SAC ¶¶ 25, 58-65.) Plaintiff alleges that the expense reimbursements constitute wages, and therefore the wages and overtime reflected on wage statements was inaccurate. (SAC ¶ 60.) Plaintiffs' derivate wage statement claims fail under *Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 680 (9th Cir. 2021). In *Magadia*, the employer, Walmart, paid its employees and issued wage statements every two weeks. Walmart provided the required paystubs, and the rates on those paystubs were accurate.

Walmart also offered quarterly bonuses to high-performing employees. Because California considers certain employees' bonuses to be part of the employees' "regular rate of pay" when calculating overtime rates, Walmart was required to adjust the rate of overtime pay it awarded employees to account for the bonuses, which were calculated and paid quarterly. As such, Walmart made an "after-the-fact adjustment to overtime pay," retroactively calculating the difference between the employees' overtime pay rate over the quarter and the employees' overtime rate as if the bonus had been paid as part of the base rate of pay. *Magadia, supra,* 999

---

[16] Notably, the class members do not need wage and hour regulations to be made whole, rather the class members will be made whole under Section 2802 if a jury finds the team colors were a uniform. Permitting a nonwage claim to trigger a wage claim is not only unsupported by the law, but it would result in a double recovery to Plaintiffs. For example, a class member could recover $40 in uniform expenses and be made whole, yet have a windfall of $20 in wages if it is determined his pay during a particular pay period fell $20 below the minimum wage as a result of the uniform expense.

F.3d at 680–81. Walmart then reported both the bonus and the adjusted overtime pay as lump sums on the wage statements at the end of each quarter.

The plaintiff alleged that that Walmart's wage statements violated Labor Code § 226(a)(9) because the adjusted overtime pay statement did not include hourly rates of pay or hours worked over the quarter. *Magadia, supra,* 999 F.3d at 673. In rejecting this claim, the Ninth Circuit found that Walmart did not violate the wage statement law because there was "no hourly rate in effect" during the pay period for the overtime adjustment. *Id.* at 680. The Ninth Circuit found that the "overtime adjustment [was] no ordinary overtime pay with a corresponding hourly rate." *Id.* at 681. Rather, it was a "non-discretionary, after-the-fact adjustment to compensation based on the overtime hours worked and the average of overtime rates." *Id.* The Court concluded that because Walmart had to retroactively calculate the overtime adjustment based on work from six prior periods, it was not an "hourly rate in effect" for purposes of § 226(a)(9). *Magadia, supra,* 999 F.3d at 682.

The same analysis applies here. There is no dispute that the wage statements issued to the Rite Aid class members were accurate at the time of their issuance. The statements would only potentially *become* inaccurate if there were an adjudication in this case that the class members were owed reimbursement for uniforms. Assuming *arguendo* that the class members were entitled to reimbursement of uniform expenses, there cannot be a claim for inaccurate wage statements because, as an *Magadia,* there was no "hourly rate in effect during the pay period" for the any uniform expense adjustment. As the Ninth Circuit recognized, "to be 'in effect during the pay period,' the hourly rate must have been 'operative' or 'in force' 'throughout the whole continuance of' or 'in the time of' the pay period in the wage statement. It does not apply to an artificial, after-the-fact rate calculated based on overtime hours and rates from preceding pay periods that did not even exist during the time of the pay period covered by the wage statement. *Magadia, supra,* 999 F.3d at 681 (citing *Morales v. Bridgestone Retail Operations, LLC*, No. G057043, 2020 WL 1164120, at *1 (Cal. Ct. App. Mar. 11, 2020) (unpublished)).

The basis for an "after-the-fact adjustment" here is even *less* ascertainable than it was is *Magadia.* There, the adjustment was based on quarterly performance. Here, any "adjustment"

1   would be the result of years of highly contested litigation and a trier-of-fact's acceptance of

2   Plaintiffs' position, based on a survey conducted experts hired by lawyers. The "adjustment"

3   would the outcome this a litigated legal question concerning uniforms, not the reflection of an

4   "hourly rate in effect during the pay period." Therefore, Plaintiffs' fourth cause of action fails

5   because they cannot prove they "suffer[ed] injury as a result of a knowing and intentional failure

6   by an employer to comply with the statute." *Magadia, supra*, 999 F.3d at 680 (citing *Price v.*

7   *Starbucks Corp.*, 192 Cal. App. 4th 1136, 1142 (2011)).

8   **IV.   CONCLUSION**

9        There is nothing "distinctive" about a pair of "khaki" pants or a "navy blue" shirt,

10  especially considering the wide variety of shades, colors, and styles people wore at Rite Aid.

11  Khaki pants and blue shirts are common wardrobe items and are generally usable in the retail

12  industry. The undisputed facts compel the conclusion that the clothing at Rite Aid was not

13  uniform, nor was it a uniform under the law. As such, Defendants are entitled to summary

14  judgment, or at least partial summary judgment.

15

16        DATED: July 20, 2021          KLEIN, HOCKEL, IEZZA & PATEL P.C.

17                                      /s/ Thomas K. Hockel

18                                      THOMAS K. HOCKEL
19                                      Attorneys for Defendants
20                                      RITE AID CORP. and THRIFTY PAYLESS, INC.

21

22

23

24

25

26

27

28