**AIMAN-SMITH & MARCY**
PROFESSIONAL CORPORATION

Randall B. Aiman-Smith #124599
Reed W.L. Marcy #191531
Hallie Von Rock #233152
Brent A. Robinson #289373
7677 Oakport St. Suite 1150
Oakland, CA 94621
T 510.817.2711
F 510.562.6830
ras@asmlawyers.com
rwlm@asmlawyers.com
hvr@asmlawyers.com
bar@asmlawyers.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| KRISTAL NUCCI and KELLY SHAW, individually and on behalf of all others similarly situated and the California Labor & Workforce Development Agency, and ANA GOSWICK, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RITE AID CORPORATION, THRIFTY PAYLESS, INC. and DOES 1-10, inclusive,<br><br>Defendants. | Case No.: 19-cv-01434-LHK<br><br>**DECLARATION OF DWIGHT STEWARD, PH.D., IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DECERTIFY CLASS**<br><br>The Honorable Lucy H. Koh<br>Date:        September 30, 2021<br>Time:        1:30 p.m.<br>Courtroom:   8, 4th Floor, San Jose |

# DECLARATION OF DWIGHT STEWARD, PH.D. IN OPPOSITION TO MOTION TO DECERTIFY CLASS

I, Dwight Steward, Ph.D., declare as follows:

1. I am an economist and statistician. I provided an expert report for plaintiffs in this action, which I will refer to herein as my "Report," which further states my qualifications and experience. As part of Defendants' Motion to Decertify Class, my Report was attached as Exhibit 7 to the Declaration of Sweta Patel at ECF Dkt. 98-2.

2. I reviewed Defendants' Motion to Decertify Class and provide clarification of statements made by Defendants about my Report below.

3. Rite Aid contends in its Motion for Decertification that there is a discrepancy in my Report at paragraph 13 and my deposition testimony. *See*, Motion to Decertify, Page 14. There is no discrepancy. In my Report, at paragraph 13, I stated that "[a]ccording to Dr. Petersen's survey results, the average number of pay periods that are reduced to clothing purchases is 5.5…." In my deposition, I confirmed that the statements made in paragraph 13 were based upon the survey results obtained by Dr. Petersen. For example, I stated the following in regard to questions by Rite Aid counsel about paragraph 13: "Again, as I said, I rely on Dr. Petersen for the numbers. Dr. Petersen told me that that's from his survey results and that's the number that should be used in the analysis for damages. The steps that he made, I don't go into that. That's not important to the scenario." (Depo. 33:9-14) A true and correct copy of an excerpt of my deposition with the foregoing response is attached here in Exhibit 1. Thus, both my declaration and deposition testimony accurately state that the number of pay periods used for clothing purchases was based upon Dr. Petersen's survey results.

4. Similarly, Rite Aid contends in its Motion for Decertification that Jeffrey Petersen, Ph.D. "verbally communicated his 'projected potential number' of 5.5 pay period violations, the basis for which is not in his Expert Report, to Dr. Steward's office, leaving it to Dr. Steward to decide how to use the data to calculated minimum wage damages." *See*, Motion to Decertify, Pages 22-23. This statement is inaccurate.

5. In April 2021, prior to my Report being written, Jeffrey Petersen, Ph.D., sent my

**Declaration of Dwight Steward, Ph.D. in Support of Opposition to Motion to Decertify**
*Nucci, et al. v. Rite Aid Corporation*  Case No. 19-cv-01434-LHK
Page 1

1  office a copy of his full survey results in an Excel format.  In "Table 4" of the Excel, Dr. Petersen
2  set forth data from the survey related to the number of paychecks reduced by purchases made by
3  survey respondents.  Dr. Petersen identifies the weighted average for one-time purchases, weighted
4  average for multiple purchases within the same pay period, and the weighted average for multiple
5  purchases in different pay periods.  Below this data, Dr. Petersen then identifies the "Number of
6  Paychecks Reduced by Clothing Purchases per Class Member" as 5.5.  I produced a copy of the
7  Excel provided to my office by Dr. Petersen in response to Rite Aid's Notice of Deposition, Bate
8  Stamped Plaintiffs 001465.  A copy of "Table 4" of the Excel spreadsheet provided to my office
9  by Dr. Petersen is attached here as Exhibit 2.

10     6. Along with providing this Excel spreadsheet, Dr. Petersen also confirmed in a
11  telephone conversation with my office that based upon his survey results, he calculated that
12  clothing purchases were made over an average of 5.5 pay periods.

13     7. For calculating minimum wages, I rounded down from the average of 5.5 pay
14  periods to 5 pay periods as the number of paychecks reduced by clothing purchases.

15     8. Rite Aid contends in its Motion for Decertification that the Report "provides no
16  evidence of employee wages at the time of purchases." *See*, Motion to Decertify, Page 22.  This
17  statement is incorrect.

18     9. In my Report, I confirm that I reviewed the time keeping data provided by Rite Aid,
19  which had wage rates listed in the data.  As I state in Paragraph 12 of my Report: "The amount of
20  money earned in each pay period for each class member is obtained from the time records
21  provided by Rite Aid.  The total amount in each day is calculated by multiplying the class
22  member's base hourly wage by the number of hours worked in that day.  The total amount earned
23  by the class member in a pay period is calculated by totaling the total pay earned in each day of
24  that week."  Along with my report, I provided Rite Aid with all of the underlying data and
25  calculations, which included employee wages for each pay period.

26     10. Rite Aid contends in its Motion for Decertification that "Dr. Steward makes no
27  attempt to analyze the data, what little there is, to space out the purchases for the purpose of
28  calculating minimum wages." *See*, Motion to Decertify, Page 23.  This statement is incorrect.

**Declaration of Dwight Steward, Ph.D. in Support of Opposition to Motion to Decertify**
*Nucci, et al. v. Rite Aid Corporation*                                                Case No. 19-cv-01434-LHK
Page 2

1  11. In my Report, I provided two calculations for the minimum wage violations, which both include an analysis of the data for spacing out the purchases for calculating minimum wages. The first calculation is based upon the assumption that class members made clothing purchases during the first 5 pay periods of their employment. In my deposition, I was asked "What supports that as the methodology to use in this case?" I provided the following response:

> "Again, I believe it to be reasonable, and there is no data to tell me when that occurred, so in the absence of the data the next thing to do is figure out what's reasonable. And from what I have seen in my experience as a labor economist, and as a professor teaching economics, as an employee, when you're in a job that requires a uniform, you're going to typically need to get those items at the beginning of your period, of the time at least at some point, because you need those clothes.
> For example, we have some people in the data that only worked six pay periods, so obviously those would occur at the beginning for that period. So that's just a reasonable assumption based on my knowledge of the labor market, based on my discussions with Dr. Petersen in terms of how his survey was done, based on all the information that we do have." (Depo. 36:6-37:2)

12. A true and correct copy of an excerpt of my deposition with the foregoing response is attached here in Exhibit 1.

13. The second calculation for minimum wage violations in my Report assumed that the class member made the uniform purchases in the weeks that the class member earned the most amount of money during their employment at Rite Aid. *See,* Report, fn. 2. Accordingly, in this second calculation, I spaced out the purchases for the purpose of calculating minimum wages. Taking the weeks when the class member had their highest income is the most conservative analysis of the data that could be implemented when calculating minimum wage violations.

/ / /

/ / /

**Declaration of Dwight Steward, Ph.D. in Support of Opposition to Motion to Decertify**
*Nucci, et al. v. Rite Aid Corporation*       Case No. 19-cv-01434-LHK
Page 3

14. I also spaced out the purchases for the purpose of calculating minimum wages for the survey participants. As I state in my Report, at Table 1.C., the survey participants responses were used in place of the average, if the individual reported pay period uniform purchases lower than the average. Thus, for example, if a survey participant responded that he or she made purchases over 3 pay periods, I used 3 pay periods for their minimum wage violation calculations. If the wages for the survey participant were not reduced below the minimum wage in the pay period, no minimum wage violation would be counted (which is the same as for other class members).

15. Rite Aid contends in its Motion for Decertification that "the Expert Damages Report does not similarly exclude individuals who worked 20 shifts or more." *See*, Motion to Decertify, Page 25. I assume that there is an error in this statement, and it is meant to state "does not similarly excluded individuals who worked 20 shifts *or less*." Based upon this assumption, Rite Aid's statement is inaccurate because the damages analysis does reduce the damages for those class members that worked less than 20 shifts. For class members who worked less than 5 pay periods (i.e., less than 20 shifts), their damages were reduced proportionately. For example, for the damages for unreimbursed clothing purchases, the average amount spent of $286 was reduced based upon the number of pay periods worked. If a class member worked two out of the five pay periods, the calculation was for two-fifths of the $286. Accordingly, my Report did take into consideration the reduced purchases by class members who worked less than 20 shifts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _August 2nd_, at _Austin, TX_

_____
Dwight Steward, Ph.D.

Declaration of Dwight Steward, Ph.D. in Support of Opposition to Motion to Decertify
*Nucci, et al. v. Rite Aid Corporation*                                    Case No. 19-cv-01434-LHK
Page 5

Exhibit 1

Page 1

```
1              UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF CALIFORNIA
3
4
5   KRISTAL NUCCI,individually)
    and on behalf of others   )
6   similarly situated, et al.)
                              )
7                             )
         Plaintiffs,          )
8                             )
                              )
9        VS.                  ) Case No. 5:19-cv-01434-LHK
                              )
10                            )
    RITE AID CORPORATION      )
11  THRIFTY PAYLESS, INC., and)
    DOES 1-10, inclusive,     )
12                            )
                              )
13       Defendants.          )
    _____)
14
15
16  DEPOSITION OF:
17            DWIGHT D. STEWARD, PH.D.
18            WEDNESDAY, JUNE 2, 2021
19            10:45 A.M.
20
21
22
23  Job No. CS4617953
24  Reported by:   GINA M. CLOUD
25                 CSR No. 6315
```

1  that should be used.  I didn't ask him.
2      Q.   So to be clear, you don't know what the
3  basis for that 5.5 number is, correct?
4      A.   No, I do know the basis.
5      Q.   Do you know how he calculated it?
6      A.   No, I know the basis.
7      Q.   What do you mean by that when you say the
8  basis?
9      A.   <u>Again, as I said, I rely on Dr. Petersen for
10 the numbers.  Dr. Petersen told me that that's from
11 his survey results and that's the number that should
12 be used in the analysis for damages.  The steps that
13 he made, I don't go into that.  That's not important
14 to the scenario.</u>
15     Q.   So the basis, as you understand it,
16 Dr. Petersen told you that's the number to use and
17 told you it's in his survey results?
18     A.   No.  I'm going to go back to the way I
19 described it.  I had the discussion with Dr. Petersen
20 in terms of that number of what number, how many pay
21 periods are there.  Dr. Petersen described the
22 survey.  We talked about that and he said 5.5 is the
23 analysis -- is the number to use.
24          As far as how he got to that, that's on
25 Dr. Petersen.  I don't recall the specifics of what

1  purchases at the beginning of your employment because
2  you need the clothes.  But as I said before, I ran
3  another scenario which is not dependent on the first
4  five periods, but again, I think that's very
5  reasonable.
6      Q.   Let's keep talking about this scenario of
7  the five, first five pay periods, for a moment.
8  What supports that as the methodology to use in this
9  case?
10     A.   Again, I believe it to be reasonable, and
11 there is no data to tell me when that occurred, so in
12 the absence of the data the next thing to do is
13 figure out what's reasonable.  And from what I have
14 seen in my experience as a labor economist, and as a
15 professor teaching economics, as an employee, when
16 you're in a job that requires a uniform, you're going
17 to typically need to get those items at the beginning
18 of your period, of the time at least at some point,
19 because you need those clothes.
20          For example, we have some people in the data
21 that only worked six pay periods, so obviously those
22 would occur at the beginning for that period.  So
23 that's just a reasonable assumption based on my
24 knowledge of the labor market, based on my
25 discussions with Dr. Petersen in terms of how his

1   survey was done, based on all the information that we
2   do have.
3       Q.   How much time was in each pay period?
4       A.   I believe the pay periods are two weeks.
5       Q.   So if I'm understanding what you're saying,
6   you think it's the proper methodology to use the
7   first five pay periods successively because people
8   buy their clothing at the beginning of their
9   employment?
10          MR. MARCY:  Objection, mischaracterizes his
11  prior testimony.
12          Go ahead and answer.
13          THE WITNESS:  No, it's a whole lot more
14  than that.  I actually described quite a bit more
15  than that.
16          Again, the first part is there is no data
17  as to when those occurred, so that's the big issue
18  so what has to happen now is to come up with
19  different ways to estimate that.  And as I've
20  described before, and you can't just take this one
21  analysis because I've done it this way, but I've
22  also done it -- and it can be done, where I look at
23  another period.
24          So as far as one methodology over the
25  other, if the court wants to look at another one,

Page 143

1      I, GINA M. CLOUD, a certified shorthand
2   reporter for the State of California, do hereby
3   certify:
4           that prior to being examined, the
5   witness named in the foregoing deposition, was by me
6   duly sworn to testify the truth, the whole truth,
7   and nothing but the truth pursuant to Section No.
8   2093 of the Code of Civil Procedure;
9           That said deposition was taken before
10  me pursuant to notice, at the time and place therein
11  set forth, and was taken down by me in shorthand and
12  thereafter reduced to typewriting via computer-aided
13  transcription under my direction;
14          I further certify that I am neither
15  counsel for, nor related to, any party to said
16  action, nor in anywise interested in the outcome
17  thereof.
18          IN WITNESS WHEREOF, I have hereunto
19  subscribed my name this 3rd day of June,
20  2021.
21
22
23  _____
                GINA M. CLOUD
24              CSR No. 6315
25

800-567-8658                                          973-410-4098

**EXHIBIT 2**

Table 4: Clothing purchase frequency questions and responses.

| Question # | Question (Abbreviated) | Response | Number | Percent | Margin of Error |
|---|---|---|---|---|---|
| 2F | Purchase timing? | All at Same Time | 78 | 16.3% | |
| | | Different Times | 399 | 83.3% | 3.3% |
| | | DK / REF | 2 | 0.4% | |
| | | Total | 479 | 100.0% | |
| 2G | Number of Purchases | Weighted Average of 2F & 2G | 6.6 | | |
| 2H | All Purchases Two Weeks Apart? | Yes | 320 | 80.2% | 3.9% |
| | | No | 35 | 8.8% | |
| | | DK / REF | 44 | 11.0% | |
| | | Total | 399 | 100.0% | |

| | |
|---|---|
| Sample Size | 479 |
| Population | 19,940 |
| Pop Adjust Factor | 98.8% |

| | |
|---|---|
| Sample Size | 399 |
| Population | 19,940 |
| Pop Adjust Factor | 99.0% |

Note: REF = Refused to answer question.  DK = Don't know answer to question.

| | | |
|---|---|---|
| Average Amount of Total Purchases | $286 | |
| Percent That Made Only One Purchase | 16.7% | |
| Percent That Made Multiple Purchases | 83.3% | |
| -- All Purchases Two Weeks Apart (Percent of Total) | 66.8% | |
| -- All Purchases Not Two Weeks Apart (Percent of Total) | 16.5% | 100.0% |
| Percent of the Class with One Pay Period Violation | 33.2% | |
| Percent of the Class with Multiple Pay Period Violations | 66.8% | |
| Average Purchases by Multiple Purchasers | 7.7 | |
| Weighted Average for Number of Purchases | 6.6 | |
| **Average Amount Spent Per Purchase** | **$43.36** | |
| Estimate Number of Paychecks Reduced by Purchases | | |
| -- Weighted Average for One-Time Purchasers | 0.167 | |
| -- Weighted Average for Multiple Purchases within Same Pay Period | 0.165 | |
| -- Weighted Average for Multiple Purchases in Diff Pay Periods | 5.160 | |
| **Number of Paychecks Reduced by Clothing Purchases per Class Member** | **5.5** | |